

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-20-1994

# Laboreres' Internat'l Union v. Foster Wheeler Corp., et al.

Precedential or Non-Precedential:

Docket 93-5208

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Laboreres' Internat'l Union v. Foster Wheeler Corp., et al." (1994). *1994 Decisions.* Paper 23.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/23

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

NOS. 93-5208, 93-5233, 93-5243

---

LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA, AFL-CIO,

Appellant in No. 93-5208

v.

FOSTER WHEELER CORPORATION;
FOSTER WHEELER ENERGY CORPORATION

---

LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA, AFL-CIO,

v.

FOSTER WHEELER CORPORATION;
FOSTER WHEELER ENERGY CORPORATION,

Foster Wheeler Energy Corporation
Appellant in No. 93-5233

---

LABORERS' INTERNATIONAL UNION OF
NORTH AMERICA, AFL-CIO,

v.

FOSTER WHEELER CORPORATION;
FOSTER WHEELER ENERGY CORPORATION,

Foster Wheeler Corporation
Appellant in No. 93-5243

---

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 85-04240)

---

Argued: December 10, 1993

Before: BECKER and NYGAARD, Circuit Judges, and
YOHN, District Judge.[0]
(Filed May 20, 1994)


THEODORE T. GREEN, Esquire (ARGUED)
MICHAEL BARRETT, Esquire
International Laborers Union of
  North America
905 16th Street, N.W.
Washington, DC  20006
        Attorneys for Laborers' Internation-
        al Union of North America

VINCENT J. APRUZZESE, Esquire (ARGUED)
FRANCIS A. MASTRO, Esquire
Apruzzese, McDermott, Mastro & Murphy
25 Independence Boulevard
Somerset Hills Corporate Center
Liberty Corner, New Jersey  07938
        Attorneys for Foster Wheeler Corpo-
        ration

STUART ROTHMAN, Esquire (ARGUED)
DAVID D. DIBARI, Esquire
Rogers & Wells
607 14th Street, N.W., 9th Floor
Washington, DC  20005-2011
        Attorneys for Foster Wheeler Energy
        Corporation

---

**OPINION OF THE COURT**

---


BECKER, Circuit Judge.

This appeal arises out of bitterly contested litigation over the applicability of a national "prehire" labor agreement to a worksite in Alabama.  At ultimate issue is the defendant employers' failure to hire the employees engaged at the site from the plaintiff

---

[0]Honorable William H. Yohn, Jr., United States District Court for the Eastern District of Pennsylvania, sitting by designation.

union's hiring hall.  The parties have been ceaselessly embroiled in this matter for over eight years.  During this time they have appeared before the district court thrice and an arbitrator once; they are now before this Court for the third time.  Given what appears to us to be the relatively modest stakes and the fact that the primary point of contention in the case will probably never recur,[0] it is unfortunate that their litigation strategies have prevented them from settling. We can only hope that the opinion that follows will edge them toward a swift resolution of their remaining disputes instead of propelling them back to the arbitrator for another round of pugnacious battle.

The principal question before us, one we will answer in the affirmative, is whether the district court erred in not applying retrospectively the National Labor Relation Board's decision in John Deklewa & Sons, Inc., 282 N.L.R.B. 1375 (1987), enf'd sub nom. Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.) (per curiam), cert. denied, 488 U.S. 889, 109 S. Ct. 222 (1988).  A host of other questions is also before us, but many of them are rendered extraneous by our resolution of the retrospectivity question.  As to those we need reach, we first conclude that the district court properly referred the issue of damages to the arbitrator, but should also have referred the question of breach as well.  In addition, we will clarify the mandate we issued the last time the parties appeared before this Court --specifically, we will describe its effect on two factual findings which an arbitrator had made and the

[0]See Letter from John D. Burgoyne, Assistant General Counsel, National Labor Relations Board, to Stuart Rothman, Esq., Counsel to Foster Wheeler Energy Corp. (Aug. 4, 1993), in Reply Br. of FWEC, App. A.

3

district court had adopted prior to the parties' second rendezvous here -- and comment on the employers' contention that no damages may flow from their alleged breach of the prehire agreement because the union operated an illegal hiring hall in contravention of the prehire agreement as well as state and federal law.

In the end, we will instruct the district court to modify its Order of June 22, 1992, as modified on March 11 and 31, 1993, and to direct the parties to arbitrate the issue of breach of their pre-hire agreement in addition to the issue of damages, if any, flowing therefrom.

## I.  BACKGROUND

### A.  Facts

#### 1.  The Parties

Foster Wheeler Corporation ("FWC") is a major international construction firm with its principal place of business in Livingston, New Jersey.  For a long time it was an exclusively union shop employer. It entered into its first National Agreement with the Laborers' International Union of North America, AFL-CIO ("LIUNA") in 1973, agreeing thereby, among other things, to recognize and acknowledge LIUNA as the exclusive bargaining representative for all field construction workers it would employ.  LIUNA, in return, guaranteed that the terms of the agreement would govern irrespective of locale.

In 1974, in pursuit of a longterm expansion plan, FWC reorganized its commercial operations and became a holding company. Among FWC's motives for reorganizing was to become a double-breasted

4

contractor, that is, to establish the capability to compete in both the open shop and the union shop markets. On November 11, 1974, FWC notified LIUNA that it had transferred its domestic engineering, manufacturing, and construction activities to Foster Wheeler Energy Corporation ("FWEC"), a newly formed, wholly-owned subsidiary, and that it had correspondingly assigned to FWEC all labor agreements covering the affected employees. Since then FWC has neither performed field construction work nor entered into field construction labor agreements; instead, FWEC (but not FWC) was listed as the employer in each subsequent National Agreement with LIUNA. FWEC itself was segmented into independently operated divisions, including Foster Wheeler World Services ("FWWS"), which performed all of FWEC's field construction work on a union basis, and Houston Engineering Center ("HEC"), which performed FWEC's engineering and procurement services.

Four years later, FWC furthered its 1974 reorganization plan and spawned Energy Plant Constructors, Inc. ("EPC"), a wholly-owned subsidiary which FWC formed and designed as the open shop counterpart to FWEC. To implement its open-shop policies, EPC hired its own employees and administered its own labor relations policies. EPC discontinued business operations in 1987.

LIUNA is the parent body of LIUNA Local 70 of Mobile, Alabama. The Local, in accordance with its constitution and bylaws, is affiliated with a regional building and trades council, Mobile Building Trades Council ("MBTC"). MBTC represents and acts on behalf of LIUNA Local 70 with regard to the negotiation and administration of labor agreements.

5

## 2. The Agreement

On April 20, 1982, FWEC and LIUNA entered into the National Agreement (the "Agreement") at issue here. The Agreement applied to all construction projects "performed by the Employer or by any person, firm or corporation owned or financially controlled by the Employer" within the political boundaries of the United States, except for those performed in one of three states (not including Alabama) already subject to a Tri-State Agreement.

On covered projects, the Agreement imposed several noteworthy requirements on FWEC: to hire employees through the referral systems of LIUNA's local affiliates; to recognize LIUNA as the exclusive bargaining agent for those employees; to adhere to certain requirements regarding wages, fringe benefits, and overtime; and to compel its subcontractors to comply with the substantive terms of the Agreement. The Agreement, however, expressly relieved FWEC of any obligation to recruit laborers through any local area hiring hall whose procedures violated state or federal laws or discriminated for or against laborers on the basis of their union membership.

## 3. The Project

At approximately the same time as FWEC was entering into its new agreement with LIUNA, Mobil Oil Exploration & Producing Southeast, Inc. ("MOEPSI") began the process of selecting a general contractor to oversee the engineering and construction of a sour gas treatment and sulfur recovery facility it wanted built at Bayou

Jonas near Mobile. The project consisted of an offshore platform and natural gas production facility, a pipeline to carry the gas onshore, and a sour gas treatment and sulfur recovery plant (the only portion of the project to which this case relates). Through a rather convoluted set of developments, MOEPSI eventually nominally awarded the construction contract for the gas processing plant to EPC in October 1984, with FWC guaranteeing EPC's performance and EPC nominally subletting the engineering work to HEC (a divison of FWEC). This arrangement as depicted by the documents was suffused with subterfuge, however, for it is quite clear from the record, as both the district court and the arbitrator independently found, that in reality FWEC was the actual prime contractor on the MOEPSI project and EPC its subcontractor.[0]

---

[0]As the first step in its selection process, MOEPSI sent detailed questionnaires to 21 companies, including FWC. Since it no longer had any engineering or construction capabilities of its own, FWC referred the questionnaire to FWEC. Although neither FWEC nor FWC had ever engineered or constructed the precise type of facility MOEPSI specified, FWC forwarded the questionnaire to FWEC and not EPC, because only FWEC (which had worked on many more projects than had EPC) had the experience MOEPSI demanded.

During 1982 and 1983, MOEPSI twice reviewed and pared down the initial solicited applications, and on August 22, 1983 MOEPSI revealed a "short" list of five contractors which it asked to submit comprehensive bids. FWEC did not make the "short" list, but Ortloff Corporation ("Ortloff"), a Midland, Texas contractor with close ties to FWEC, did. Ortloff and FWEC had earlier reached an understanding that each would consider bringing the other one in on projects in the $10-$150 million range that it was awarded or was pursuing. That option appealed to Ortloff when FWEC suggested they jointly pursue the MOEPSI project because it did not wish to individually take on the risks involved. The two agreed to cooperate on preparation of a joint bid, but MOEPSI conditioned consideration of a joint bid on a single entity taking overall responsibility for the project. As a result of Ortloff's equivocations, FWEC agreed to serve as the prime contractor for the project and Ortloff assumed responsibility for the construction work and certain specialized engineering services.

In the course of preparing its proposal for a joint bid with Ortloff, FWEC apparently determined that MOEPSI wanted to use

7

non-union labor on the Bayou Jonas project, and therefore FWEC arranged with Ortloff to have Foster Wheeler Intercontinental Corporation ("FWIC") -- an international subsidiary of FWC with no employees in the United States but subject to no union obligations -- substitute as the prime contractor. The only practical effect of having FWIC rather than FWEC be the contracting party was that a non-union entity would <u>bid</u> on the construction work. There ensued a campaign of subterfuge directed at MOEPSI and LIUNA, only a portion of which we will recount here, which entailed FWEC holding out FWIC as the non-union bidder, whereas in fact only FWEC, a signatory to the Agreement, was working on the project.

On February 8, 1984, John Sarappo, Vice President of FWEC, sent the joint bid to MOEPSI on FWIC letterhead, in which he proposed that FWEC's engineering and procurement services division, HEC, manage the project and engineer the utility and supporting facilities, and that Ortloff engineer the process units and construct all the facilities. MOEPSI promptly agreed, whereupon the staff of FWEC (rather than that of FWIC) began preparing the bid documents.

Shortly before the bid package was to be submitted, however, MOEPSI in a sudden about-face determined that Ortloff lacked the capacity to construct the project, placing FWEC under significant time constraints to find an acceptable replacement subcontractor. Following a quick review of three alternative open shop companies, including EPC, FWEC's open-shop sibling construction company, Sarappo approved the selection of EPC to supplant Ortloff in all its responsibilities except for those in connection with certain specialized engineering technologies. FWIC, in keeping with its disguised role as the prime contractor, submitted the bid package to MOEPSI on May 1, 1984, designating FWEC and EPC -- the actual work engines -- as its subcontractors. The bid was signed by W. Robert Campbell, who falsely identified himself as the area sales manager for FWIC whereas in fact FWEC employed him as an account sales engineer.

MOEPSI negotiated with the five qualified bidders and scrutinized their bid packages over the next five months. It eventually narrowed the candidate pool down to two, of which the FWIC/FWEC/EPC/Ortloff combined bid earned the highest marks. In the final days before the bid was to be awarded, however, MOEPSI's legal counsel determined that the prime contractor should have an Alabama general contractor's license. As FWIC -- an <u>international</u> contractor -- was not in possession of the requisite license, MOEPSI decided it could no longer serve as even the nominal prime contractor. To preserve the FWIC/FWEC/EPC/Ortloff bid package, MOEPSI assented to EPC, which did hold an Alabama general contractor's license, replacing FWIC as the prime contractor (FWC, of course, preferred substituting EPC instead of FWEC for FWIC so that it could continue its pretense about the prime contractor being open shop), but only under the qualification that FWC guarantee EPC's performance. FWC willingly executed the requested guarantee.

8

The local press widely publicized MOEPSI's award of the contract to EPC -- as well as EPC's open-shop policy -- during the fall and winter of 1984. LIUNA officials, suspicious of the goings-on, made numerous inquiries to the defendants concerning the application of the Agreement to the MOEPSI project. Apparently in each instance the defendants informally told the LIUNA officials that EPC was a non-union contractor not bound by the Agreement, and that, accordingly, the project would be completed by non-union labor. There is disputed evidence regarding whether FWEC affirmatively misrepresented to LIUNA its part in the project and its relationship to EPC.

As already mentioned, the Agreement required signatory employers to comply with the hiring provisions of local affiliates, but only if they were operated legally and did not discriminate against non-union laborers. MBTC, LIUNA's local affiliate, operated a hiring hall for construction workers, but, to LIUNA's chagrin, it discriminated against non-union members.[0] Seemingly unaware of MBTC's discrimination, EPC -- itself not a signatory to the

---

With this final obstacle overcome, MOEPSI awarded the contract to EPC during the last week of September, 1984. The contract was formally executed on October 1, 1984. In a separate contract, EPC nominally sublet the engineering work on the project to FWEC.

[0]Testimony at trial from the secretary-treasurer of MBTC, who was responsible for making referrals, casts substantial doubt on the equality of the hall's treatment of non-union members. The evidence led the district court to find that the procedures MBTC employed to fulfill work requests favored union over non-union workers, and hence to conclude that MBTC ran an illegal hiring hall. Because at the time LIUNA had placed the local into trusteeship, LIUNA was responsible for the discrimination. No evidence was proffered, however, showing that any of the defendants knew about this practice (or that LIUNA officials in fact knew about it) during the period the MOEPSI project underwent construction.

9

Agreement --opened its own hiring office for the MOEPSI project on January 29, 1985. Since the local press had widely publicized the available job opportunities, EPC received over 5,000 applications in the three days the hiring office accepted them. EPC hired all the construction workers it employed on the MOEPSI project either through the applications that were submitted at that office or at the entrance to the job site. On April 2, 1985, the day EPC hired its first laborer for the project, the local union had over 200 union supporters on the local hiring hall's out-of-work list, although some unspecified number of them were busy working for non-union contractors.

## 4. The Dispute

On April 9, 1985, LIUNA sent out a formal grievance letter to the various entities related to FWC involved with the MOEPSI project -- namely, FWC, FWIC, FWEC, and EPC -- claiming that each of them was in violation of the Agreement as a result of its participation in the MOEPSI project (insofar as the laborers had not been hired out of LIUNA's affiliate's, MBTC's, hiring hall). FWEC's counsel responded about one month later that FWEC would sometime in the future formally address the matters raised in LIUNA's letter, but that in the meanwhile he would meet informally with LIUNA representatives to discuss any difficulties clouding their relation-ship. Approximately one month after that, on June 3, 1985, EPC through its president also answered LIUNA's letter by denying any contractual obligation toward LIUNA and, in the alternative, providing notice of termination of any collective bargaining

10

agreement it may have been a party to, whether by operation of law or otherwise. When several subsequent meetings between FWEC and LIUNA failed to resolve the matter, FWEC formally responded to LIUNA's grievance in a letter dated July 11, 1985, reiterating its previous position and stating:

> Since the work in question is presently being undertaken by a company over which FWEC does not have and can exert no control, the LIU[NA]/FWEC National Agreement is not applicable. There is a different bargaining unit there with a different employer who, as we have very recently been given to understand, is proceeding pursuant to its agreement with the owner. FWEC employs no field construction laborers or mechanics at Mobile. There is nothing FWEC could do to make local labor agreements applicable.

Less than one month later, EPC filed a Petition for Election with the National Labor Relations Board ("NLRB" or "Board") to elect a union representative for all EPC's field construction employees at the MOEPSI project, or, more precisely, to dispel any doubts or reservations concerning whether the Agreement applied to the project at all by demonstrating LIUNA's lack of majority support amongst the workers. The Board failed to reach a decision on EPC's petition for several months and never completed the election.

In the meantime FWEC formally modified its stance toward LIUNA: although it still maintained that the Agreement did not pertain to its activities on the MOEPSI project, on August 9, 1985 it expressly repudiated the Agreement to the extent that the Agreement was found to apply to the MOEPSI project. It identified Painters Local Union No. 64 of Brotherhood of Painters v. Epley, 764 F.2d 1509 (11th Cir. 1985), cert. denied, 475 U.S. 1120, 106 S. Ct. 1636 (1986) as establishing its right to limit its repudiation of an area-wide prehire agreement to a single job site. The Eleventh

11

Circuit Court of Appeals, the court exercising jurisdiction over the situs of the MOEPSI project, had handed down Epley a scant month earlier. At that time, of course, FWEC had already committed itself internally to using non-union labor, and, furthermore, had contractually bound itself to MOEPSI to use EPC as the non-union construction subcontractor (although, as structured on paper, EPC was the (nominal) prime contractor and FWEC the (nominal) subcontractor, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**).[0]

---

[0] About this time the parties became enmeshed in some collateral litigation before the Board, litigation which does not directly affect the outcome here but which helps set the stage. Coincidentally on the same day that FWEC notified LIUNA of its limited repudiation, LIUNA filed separate unfair labor practices actions against FWC, FWEC, and EPC for their failure to provide it with information it alleged § 8(a)(5) of the National Labor Relations Act ("NLRA"), 11 U.S.C.A. § 158(a)(5) (1973), gave it a right to. Each action was in turn dismissed by three different Regional Directors of the NLRB, principally on the ground that the Agreement was a prehire agreement pursuant to § 8(f), id. § 158(f), but that LIUNA had not demonstrated that it had achieved majority status at the work site as was necessary to convert the § 8(f) prehire agreement into a § 9(a), see id. § 159(a), collective bargaining agreement. That conversion was crucial to the charges LIUNA levelled against FWC, FWEC, and EPC, because only a collective bargaining agreement imposes on the employer the statutory duty to bargain with the employees' union representative and derivatively to supply that representative with information. The three regional decisions were joined for purposes of appeal and thereafter affirmed by the Board's General Counsel for substantially the reasons given by the Regional Directors.

As the text above touched upon, EPC for its part on August 1, 1985, filed a petition in Region 15 of the NLRB (encompassing Mobile) to hold a representation election, in which EPC requested an election among all its field construction employees at the MOEPSI project. NLRB Petition 15-RM-387. LIUNA moved to dismiss the petition, asserting that the election was slated to poll all of EPC's field construction workers whereas it had disclaimed any interest in representing all those employees because traditionally it represented only some categories of workers at the site -- the construction workers but not the skilled craftspersons and their associates. On November 18, 1985, over LIUNA's objection, the Regional Director issued a Decision and Direction of Election in

By letter dated May 15, 1986, FWEC validly repudiated the entire (National) Agreement according to its terms effective July 15, 1986.

## B. Procedural History

### 1. Round 1

On August 29, 1985, LIUNA filed this action on behalf of itself, its local, and its membership against FWEC and FWC under §301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C.A. §185(a) (1978). LIUNA sought to compel FWEC and FWC to submit to arbitration LIUNA's grievance concerning the applicability of the Agreement to the MOEPSI project. The Complaint alleged that FWEC, FWC, FWIC, and EPC were alter egos and/or a single employer, and hence that all of them were bound by the Agreement. The Complaint further alleged that EPC, FWC, and FWIC each had breached the Agreement in connection with the MOEPSI project.

Upon considering defendants' alternative motions to dismiss, change venue, and stay the proceedings pending the outcome

---

response to EPC's petition. Among other conclusions, he resolved that 1) the Agreement constituted a prehire agreement under § 8(f); 2) the work unit could not be split into different sub-units for election purposes; 3) LIUNA had not demonstrated it had achieved majority status at the work site; and 4) EPC's filing of the Petition for Election would allow it to repudiate any prehire agreement which might have been in effect between EPC and LIUNA if the vote demonstrated that LIUNA lacked majority status among all the field construction workers at the work site. Based on these conclusions, the Director ordered an election involving all the field construction employees, and apparently one was held. LIUNA appealed from that decision, however, and when the appeal was granted the ballots were impounded. The Board remanded the matter to the Regional Director, but since another election was never held before FWEC and EPC completed the project, the Board on June 1, 1988 vacated its remand order and dismissed the petition as moot.

of the representation election scheduled at the MOEPSI site as well as plaintiff's motion for summary judgment, the district court on December 9, 1985 granted plaintiff's motion and ordered FWC and FWEC to submit LIUNA's grievance to arbitration. The court decided first that the Agreement as signed was a prehire agreement pursuant to § 8(f) of the National Labor Relations Act ("NLRA"), 29 U.S.C.A. § 158(f) (1973), not a collective bargaining agreement pursuant to § 9(a) of the NLRA, see id. § 159(a).[0] Next, it resolved that since EPC's employees at MOEPSI had not yet elected a bargaining

---

[0]The distinguishing feature of a prehire agreement as compared to a collective bargaining agreement is that an employer and a union enter into it before the workers to be covered by the agreement and represented by the union have even been hired. The basic provisions of the NLRA forbid the employer from bargaining with a union which has not been "designated or selected by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C.A. § 159(a) (1978). Although other methods exist, designation or selection is best accomplished by the cumbersome and time-consuming instrument of election by secret ballot. See id. § 159(c)(1) (providing for certification as the employees' representative). Prehire agreements developed in the fluctuant construction trade because the typically short duration and seasonal variation of employment in that industry make designating a union representative using the procedures developed for the more stable industries, such as manufacturing, unworkable.

Responding to the particularized needs of the construction industry and recognizing the practices prevailing prior to the Board's invalidation of prehire agreements (the Board disapproved of prehire agreements shortly after obtaining jurisdiction over the construction industry in 1947, see NLRB v. Irvin, 475 F.2d 1265, 1267 (3d Cir. 1973)), Congress engrafted § 8(f) onto the NLRA in 1959. That amendment allowed a union to act as the bargaining representative for employees before the Board certified it as enjoying majority status. See Iron Workers, Local 3, 843 F.2d at 772-74; S. REP. No. 187, 86th Cong., 1st Sess. (1959), reprinted in 1959 U.S.C.C.A.N. 2318, 2344; I CHARLES J. MORRIS, THE DEVELOPING LABOR LAW, at 48, 714-15 (3d ed. Patrick Hardin ed. 1992). Once the union has attained majority status, the § 8(f) prehire agreement is converted into a § 9(a) collective bargaining agreement. See NLRB v. Local Union No. 103, Int'l Ass'n of Iron Workers (Higdon Constr. Co.), 434 U.S. 335, 349-50, 98 S. Ct. 651, 660 (1978); see also supra at **Error! Bookmark not defined**. n.**Error! Bookmark not defined**..

14

representative and since LIUNA did not even claim majority status at the MOEPSI site, the Agreement had not yet been converted into a collective bargaining agreement under § 9(a).

The court then ordered arbitration solely on the issue of whether the Agreement applied to the MOEPSI site vel non, reasoning that LIUNA had raised a colorable claim that EPC was FWEC's alter ego and that the question of the application of the Agreement to any specific project fell within the scope of the Agreement's capacious arbitration clause. The court reserved for itself, however, the questions of LIUNA's majority representation, the size and composition of the appropriate bargaining units, and defendants' alleged repudiation of the Agreement. We dismissed the defendants' appeal from the district court's arbitration order as interlocutory. See Laborer's Int'l Union v. Foster Wheeler Corp., Nos. 86-5079, 86-5080 (3d Cir. May 1, 1986).

## 2. Round 2

On November 10, 1986, after a lengthy hearing and extended briefing, Arbitrator Sam Kagel issued a decison in LIUNA's favor. The arbitrator found that FWEC and FWC were alter egos and that EPC was a joint or single employer with FWEC. Based on these findings, he concluded that EPC (through FWEC) was a party to the Agreement and consequently that both FWC and FWEC had breached the Agreement. He additionally determined that, contrary to the arrangements as they existed on paper, FWEC was the prime contractor and EPC the subcontractor at the MOEPSI site, and that the defendants had listed EPC as the prime contractor with the express intent to delude LIUNA.

15

### 3. Round 3

Just over a year later, the district court entered an order confirming the arbitrator's award insofar as he had found that the Agreement applied to the MOEPSI project, but rejecting as an improper and unnecessary appendage beyond the scope of the reference that portion of the arbitrator's decision which found that FWC and FWEC had breached the Agreement. After rejecting numerous contentions raised by the defendants, the district court turned to the date of defendants' alleged repudiation of the Agreement. Because of Deklewa's supposed deviation from the decision reached by the Supreme Court in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S. Ct. 1753 (1983) (approving the pre-Deklewa rule), the district court held that Deklewa (discussed at length infra Part 21) was invalid and refused to acquiesce in the rule it announced. This cleared the way for the court to find that FWC and FWEC had effectively repudiated the Agreement on June 6, 1985, the date LIUNA had received EPC's June 3 letter repudiating any agreement which may have existed between them.

The court wrapped up its decision with the observation that only the issues of defendants' breach and liability for damages accruing before June 6, 1985 remained. The parties thereafter stipulated to $18,500 in damages so as to expedite their appeal to this Court.

### 4. Round 4

On February 22, 1989, this Court partially vacated the district court's order, holding that the district court had erroneously allowed the arbitrator to decide whether FWC was FWEC's alter ego. The district court's error in ordering arbitration of the alter ego issue lay in its failure to realize that the question of the duty to arbitrate is one for judicial resolution, and therefore that "it is the role of the district court, not the arbitrator, to pierce the corporate veil and require a parent corporation to participate in arbitration of a contract to which a subsidiary is formally a party." Laborer's Int'l Union v. Foster Wheeler Corp., 868 F.2d 573, 576-77 (3d Cir. 1989) (per curiam).[0]

Accordingly, we remanded for the district court to determine whether the two corporations were alter egos. In the process, we vacated all of the district court's orders subsequent to the one allowing discovery on the alter ego issue which were "predicated on the assumption that FWEC was FWC's alter ego," and instructed the district court that it "may reconsider the[ vacated orders] in light of our recent decision in International Ass'n of Iron Workers, Local 3 v. NLRB, 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889, 109 S. Ct. 222 (1988)[, and enforcing Deklewa, supra]." Id. at 577.

## 5. Round 5

After the district court's proceedings recommenced, FWC and FWEC conceded in open court on January 22, 1991 that FWC was

---

[0]Cf. United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. Union, Local 342 v. Valley Eng'rs, 975 F.2d 611, 614-15 & n.7 (9th Cir. 1992) (holding that a district court must usually stay its proceedings if the Board is in the process of determining an employer's alter ego or single employer status).

17

FWEC's alter ego. After presiding over a two-day bench trial, the district court filed the opinion and order now under review on June 22, 1992.

The court first reaffirmed its prior ruling that the Deklewa rule did not apply, but, since Iron Workers, Local 3 had approved of the Deklewa rule, did so on a revised basis. Specifically, it adjudged that it would be manifestly unjust to apply the rule retrospectively to these defendants, and concluded that this Court's decision in Iron Workers, Local 3 did not dictate the automatic retrospective application of Deklewa but instead required a case-by-case evaluation of the justice of so doing. Mem. Op. at 27-29, 37-38. Analyzing the three Chevron Oil factors for guidance on whether or not to apply Deklewa's new rule of law retrospectively, see Chevron Oil Co. v. Huson, 404 U.S. 97, 106-08, 92 S. Ct. 349, 355-56 (1971), the court concluded that its application of the rule would further the rule's underlying principles, but that the rule clearly departed from prior precedent and that its application would lead to an inequitable result. As part of its analysis of this issue, the court determined that LIUNA's unclean hands, due to the discriminatory referral practices of MBTC's hiring hall, equitably estopped it from arguing that FWEC and FWC (which had cirumvented the Agreement's hiring procedures) were barred (by equitable estoppel) from justifying their repudiation of the Agreement by reason of LIUNA's lack of majority support at the MOEPSI work site.

Next, the court rescinded its earlier finding of a June 3, 1985 repudiation date, finding instead that the defendants had not

18

repudiated the Agreement until three months later on August 9, 1985. It explained that FWEC's repudiation could not have occurred before June 3, 1985 because before then FWEC and EPC had simply claimed that the Agreement did not apply to the MOEPSI project. Moreover, due to its conclusion that the defendants' scheme involving FWIC was designed to deceive LIUNA regarding the applicability of the Agreement, the court withdrew from its earlier position and found that EPC's June 3, 1985 letter to LIUNA, in which it had repudiated any agreement with LIUNA to which it may have been a party, did not suffice to repudiate the Agreement. It reasoned that EPC's June 3 repudiation did not extend to FWEC, despite the facts that FWEC and EPC were alter egos and that LIUNA had suspected that EPC was bound by the Agreement, because the defendants' calculated deception prevented LIUNA from being certain that EPC intended its repudiation to apply to FWEC as well. Finally, the court concluded that FWEC's August 9, 1985 single-site repudiation was effective. Thus, the court held that FWEC would be liable for damages LIUNA sustained up to August 9, 1985.

Having disposed of the main issue of liability, the court ordered the parties to notify it within twenty days if they could settle on LIUNA's damages, or else to submit to it the issue of damages. Upon LIUNA's Motion for Reconsideration and Clarification, the court on March 11, 1993 modified its prior order and directed the parties to submit the issue of damages to arbitration. On March 31, the court denied defendants' application to file a Motion for Reconsideration of the court's March 11 Order. It is from the June

19

22, 1992 Order, as modified on March 11 and 31, 1993, that the parties appeal.

### 6. Round 6

This appeal followed. The district court had original jurisdiction to determine whether the defendants are obligated to arbitrate a grievance arising under a § 8(f) prehire agreement pursuant to 29 U.S.C.A. § 185 (1978), see Jim McNeff, Inc. v. Todd, 461 U.S. 260, 271–72, 103 S. Ct. 1753, 1759 (1983), and we have appellate jurisdiction pursuant to 28 U.S.C.A. § 1291 (1993).[0]

---

[0]Although the district court referred the question of damages to the arbitrator without designating its order as "final," we are satisfied that we have jurisdiction pursuant to § 1291. On March 31, 1993, the district court by letter denied defendants' second Motion for Reconsideration, explaining that "[t]he issues of whether there has been any breach of the agreement and what damages might flow from that shall, as provided in the National Agreement and as I ruled on March 15, be resolved through arbitration." Letter from Honorable Harold A. Ackerman, U.S. District Judge, to Litigants in Laborer's Int'l Union v. Foster Wheeler Corp., No. 85–4240 (D.N.J. Aug. 24, 1985) (Mar. 29, 1993) (emphasis added).
In its complaint, LIUNA had sought a variety of relief in addition to an order compelling arbitration. But it submitted in its letter defending this Court's jurisdiction that "[a]lthough the remedy portion of the complaint also sought the alternative relief of a money judgment from the court, the plaintiff has not pursued that remedy. Instead, the plaintiff has consistently maintained that the damages are an issue for the arbitrator . . . ." Letter from Theodore T. Green, Counsel for LIUNA, to P. Douglas Sisk, Clerk, U.S. Court of Appeals for the Third Circuit, at 2–3 (Apr. 29, 1993). The defendants have not disputed this assertion, see Letter from Francis A. Mastro, Counsel for FWC, to P. Douglas Sisk, Clerk, U.S. Court of Appeals for the Third Circuit, at 4 n.4 (April 30, 1993), and we have not found anything in the record to the contrary.
Thus, the order compelling arbitration is the "full relief" LIUNA seeks, and no substantial issue remains outstanding for the district court to decide after the arbitration. Although the district court may still need to issue an order enforcing any arbitration award LIUNA may secure -- a fact which obtains virtually whenever a court orders a recalcitrant party to arbitrate a dispute -- the cases make clear that such a limited potential future undertaking does not torpedo an appeal prior to the arbitration.

20

II.   THE RETROSPECTIVITY OF DEKLEWA

In Deklewa, the Board abruptly reversed seventeen years of precedent established by R.J. Smith Construction Co., 191 N.L.R.B. 693, 695 & n.5 (1971), enforcement denied sub nom. Local No. 150, International Union of Operating Engineers v. NLRB, 480 F.2d 1186 (D.C. Cir. 1973) and Ruttman Construction Co., 191 N.L.R.B. 701, 702 (1971), and held that construction industry prehire agreements negotiated under §8(f) of the NLRA, 29 U.S.C. § 158(f), are no longer subject to unilateral repudiation by either the employer or the union.  See Deklewa, 282 N.L.R.B. at 1377-78.  The Board held instead that both parties must observe such contracts until "the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative."  See id. at 1385.  This represented a complete about-face:  before that decision, under the reign of the R.J. Smith rule, the employer was free to repudiate a prehire agreement at any time unless the union obtained majority status.  The union's attainment of majority status at any time subsequent to the parties' entering into the prehire agreement would "convert" the § 8(f) pre-hire into a § 9(a) collective bargaining agreement and thereby consummate a full bargaining relationship, regardless of whether the union had majority support at the time of

See Zosky v. Boyer, 856 F.2d 554, 558-60 (3d Cir. 1988), cert. denied, 488 U.S. 1042, 109 S. Ct. 868 (1989) (discussing cases); cf. Goodall-Sanford, Inc. v. United Textile Workers, 353 U.S. 550, 551-52, 77 S. Ct. 920, 921 (1957) ("A decree under § 301(a) ordering enforcement of an arbitration provision in a collective bargaining agreement is . . . a `final decision' within the meaning of 28 U.S.C. § 1291.").   If any substantial issues remained for the district court to resolve after the arbitration, of course, there would have been no final order and we would lack jurisdiction.  See, e.g., Zosky, 856 F.2d at 557-58; Nationwide Ins. Co. v. Patterson, 953 F.2d 44, 45-46 (3d Cir. 1991); Patten Sec. Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400, 403 (3d Cir. 1987).

repudiation. See NLRB v. Local Union No. 103, Int'l Ass'n of Iron Workers (Higdon Constr. Co.), 434 U.S. 335, 345, 349–50, 98 S. Ct. 651, 657–58, 660 (1978); Deklewa, 282 N.L.R.B. at 1378; Ruttman Constr. Co., 191 N.L.R.B. at 702.

The controlling question presented by this appeal is whether this new rule (issued on February 20, 1987) -- which turned the old rule on its head -- should be retrospectively applied to conduct by the parties transpiring in mid-1985. The Board for its part determined to apply the rule retrospectively to all cases pending before it. See Deklewa, 282 N.L.R.B. at 1389. Nevertheless, the district court correctly determined that retrospectivity must be decided on a case-by-case basis: in affirming Deklewa, this Court applied the new rule retrospectively to the parties before it only after engaging in a case-sensitive review of the parties' circumstances. See Iron Workers, Local 3, 843 F.2d at 780.[0]

_____

[0]LIUNA contends that the retrospectivity analysis at work here is affected by the decisions in James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 111 S. Ct. 2439 (1991) and Harper v. Virginia Department of Taxation, 113 S. Ct. 2510 (1993), which worked a major substantive change in the federal law of retrospectivity. Both decisions ruled that the Constitution outlaws selective prospectivity of Supreme Court decisions, that is, the practice of applying a new rule of law promulgated by the Court to some but not all parties in pending cases. See Harper, 113 S. Ct. at 2516 n.9, 2517–18; James B. Beam, 111 S. Ct. at 2447–48 (Souter, J., plurality opinion); id. at 2451 (Scalia, J., concurring); cf. id. at 2449 (White, J., concurring); id. at 2451–53 (O'Connor, J., dissenting); see also id. at 2451 (Scalia, J., concurring) (finding "both `selective prospectivity' and `pure prospectivity' beyond [the Court's] power"). James B. Beam produced a fragmented decision of five opinions, with no opinion garnering more than three votes, so in our discussion we will focus on Harper, the majority opinion of which attracted five votes.

Although both opinions dealt with decisions issued by the Supreme Court, given the ratio decidendi of both cases, we suspect that other courts are probably correct that there is no cogent basis

for distinguishing decisions handed down by the inferior federal courts. See Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1128 (7th Cir. 1993), cert. denied, 114 S. Ct. 883 (1994); Newport News Shipbuilding & Dry Dock Co. v. Garrett, 6 F.3d 1547, 1554 (Fed. Cir. 1993); United States v. Goodner Bros. Aircraft, Inc., 966 F.2d 380, 385 (8th Cir. 1992), cert. denied, 113 S. Ct. 967 (1993); Sterling v. Block, 953 F.2d 198, 200 (5th Cir. 1992); May v. Hobart Corp., 839 F. Supp. 309, 318 (E.D. Pa. 1993); Hebert v. Manchester, N.H., Sch. Dist., 833 F. Supp. 80, 84 (D.N.H. 1993). But see, e.g., Gruber v. Price Waterhouse, 911 F.2d 960, 965 (3d Cir. 1990) (pre-dating Harper and Beam) ("the determination of retroactivity vel non involves a balancing which must be done on a case by case basis"); Gatto v. Meridian Medical Assocs., Inc., 882 F.2d 840, 842-43 (3d Cir. 1989) (applying a case-by-case selective prospectivity analysis under Chevron Oil), cert. denied, 493 U.S. 1080, 110 S. Ct. 1136 (1990). However, we do believe that there are cogent grounds for distinguishing administrative agencies from federal courts, meaning that the Supreme Court likely would not extend the doctrine disapproving of "selective prospectivity" to agencies or Article I courts.

Both Beam's and Harper's rejection of selective prospectivity turned on principles of stare decisis and equal treatment of those appearing before the Court; those Justices who rejected pure prospectivity additionally invoked the Cases or Controversies Clause, see U.S. CONST. art. III, § 2, cl. 1. Harper placed heavy emphasis on Griffith v. Kentucky, 479 U.S. 314, 107 S. Ct. 708 (1987), overruling Linkletter v. Walker, 381 U.S. 618, 85 S. Ct. 1731 (1965), which "eliminated limits on retroactivity in the criminal context." Harper, 113 S. Ct. at 2516. Griffith reasoned that the

> failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication. First, it is a settled principle that this Court adjudicates only "cases" and "controversies." See U.S. Const., Art. III, § 2. Unlike a legislature, we do not promulgate new rules of constitutional criminal procedure on a broad basis. Rather, the nature of judicial review requires that we adjudicate specific cases . . . . But after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review.
> . . .
> Second, selective application of new rules violates the principle of treating similarly situated defendants the same. . . . As we pointed out in United States v. Johnson, [457 U.S. 537, 102 S. Ct. 2579 (1982),] the problem with not applying new rules to cases pending on direct review is "the actual inequity that results when the Court chooses which of many similarly situated defen-

23

> dants should be the chance beneficiary" of a new rule. 457 U.S., at 556, n.16, 102 S. Ct., at 2590, n. 16 (emphasis in original).

Griffith, 479 U.S. at 322-23, 107 S. Ct. at 713; see Beam, 111 S. Ct. at 2444, 2446 (plurality) (Souter, J.) (raising the equality and stare decisis rationales); id. at 2450 (Blackmun, J., concurring) (stressing the equality rationale derived from the integrity of the judicial process and referring to the stare decisis rationale); id. at 2450-51 (Scalia, J., concurring) (referring to the stare decisis rationale).

These rationales do not apply analogously to administrative agency adjudications, cf. Atlantic Richfield Co. v. United States Dep't of Energy, 977 F.2d 611, 614 (Temp. Emer. Ct. App. 1992) ("Whether Beam has any application to agency adjudications is questionable."), cert. denied, 113 S. Ct. 1256 (1993); District Lodge 64, Int'l Ass'n of Aerospace Workers v. NLRB, 949 F.2d 441, 447 (D.C. Cir. 1991) ("Whether Beam should apply to agency adjudications is unclear." (emphasis in original)); United Food & Commercial Workers Int'l Union, Local No. 150-A v. NLRB, 1 F.3d 24, 35 (D.C. Cir. 1993) (same), cert. granted sub nom. Dubuque Packing Co. v. United Food & Commercial Workers, Local No. 150-A, 62 U.S.L.W. 3657 (U.S. Apr. 4, 1994) (No. 93-1103), primarily because the doctrine of stare decisis is far less rigorous in that context, see NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787, 110 S. Ct. 1542, 1549 (1990) ("[A] Board rule is entitled to deference even if it represents a departure from the Board's prior policy."); NLRB v. Local 103, Int'l Ass'n of Iron Workers, 434 U.S. 335, 351, 98 S. Ct. 651, 660-61 (1978) ("An administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statutes."); NLRB v. J. Weingarten, Inc., 420 U.S. 251, 265-66, 95 S. Ct. 959, 967-68 (1975) ("The use by an administrative agency of the evolutional approach is particularly fitting.  To hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking."); NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766, 89 S. Ct. 1426, 1429 (1969) (plurality) (referring to the "qualified role of stare decisis in the administrative process"); NLRB v. Seven-Up Co., 344 U.S. 344, 349, 73 S. Ct. 287, 290 (1953) ("The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process."); Iron Workers, Local 3, 843 F.2d at 776 ("As decisional law has made clear, it is not the function of the courts to interpret § 8(f), nor is any initial interpretation of one act made by the Board to be deemed `frozen in concrete.'"); see also Lechmere, Inc. v. NLRB, 112 S. Ct. 841, 847-48 (1992) ("`Once we have determined a statute's clear meaning, we adhere to that

24

determination under the doctrine of <u>stare decisis</u>, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning.'" (quoting <u>Maislim Indus., U.S., Inc. v. Primary Steel, Inc.</u>, 497 U.S. --, --, 110 S. Ct. 2759, 2768 (1990) (emphasis added)).

A second, fundamental difference between agencies and Article III courts is that an agency boasts both judicial and legislative powers. When an agency exercises its legislative powers, neither the "cases" or "controversies" prerequisite, nor the rule of <u>stare decisis</u>, rears its head. And, as <u>Chenery</u> illustrates, agencies are free to exercise their legislative powers in adjudications. <u>See</u> <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 202-03, 67 S. Ct. 1575, 1580 (1947) ("[A]ny rigid requirement [that the agency fill interstices in its organic statute through rulemaking] would make the administrative process inflexible and incapable of dealing with many of the specialized problems which arise. . . . Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. . . . There is thus a very definite place for the case-by-case evolution of statutory standards."); <u>NLRB v. Bell Aerospace Co. Div. of Textron, Inc.</u>, 416 U.S. 267, 293, 94 S. Ct. 1757, 1771 (1974). Although arguably an agency endowed with rule-making powers may not announce purely prospective rules in adjudications, the restriction is not of constitutional origin. <u>See</u> <u>Wyman-Gordon Co.</u>, 394 U.S. at 761-64, 89 S. Ct. at 1427-29 (plurality of four) (stating that the Board cannot circumvent the rule-making procedural provisions of the NLRA with purely prospective adjudications); <u>id.</u> at 779, 89 S. Ct. at 1436 (Douglas, J., dissenting) ("I would hold the agencies governed by the rule making procedure strictly to its requirements . . . ."); <u>id.</u> at 781, 89 S. Ct. at 1437 (Harlan, J., dissenting) ("[T]he Labor Board has promulgated a rule in violation of the governing statute . . . .").

Finally, some agencies lack rulemaking powers, and requiring them to always apply each of their new rules retrospectively would effectively deny them the flexibility which is the cornerstone of administrative action and the <u>sine qua non</u> of administrative responsiveness. Especially as to them, a retrospective straight-jacket would be counterproductive.

Thus, the considerations prompting the <u>Beam</u> and <u>Harper</u> decisions cannot simply be transposed to the administrative context. In recognition of these important distinguishing characteristics, courts insulated from the dynamic political pressures agencies face should jealously guard their protective power to watch over agencies, so that agencies' retrospective changes to the law do not brand conduct that was legal when performed illegal when challenged when to do so would cause "manifest injustice." <u>See</u> <u>NLRB v. Majestic Weaving Co.</u>, 355 F.2d 854, 860 (2d Cir. 1966) (Friendly,

Applying what the district court believed to be the proper test, it decided not to apply <u>Deklewa</u> retrospectively.[0] <u>See</u> Mem. Op.

_____

J.) ("Although courts have not generally balked at allowing administrative agencies to apply a rule newly fashioned in an adjudicative proceeding to past conduct, a decision branding as `unfair' conduct stamped `fair' at the time a party acted, raises judicial hackles . . . ."); <u>cf.</u> <u>Landgraf v. USI Film Prods.</u>, 62 U.S.L.W. 4255, 4262 (U.S. Apr. 26, 1994) ("[R]etroactive statutes raise particular concerns.  The Legislature's . . . responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.").  But agencies should retain their power to administer their organic statutes flexibly.  Expansion of <u>Beam</u> and <u>Harper</u> to the administrative agency context is, in short, far from a foregone conclusion, and because we conclude that even under a choice-of-law analysis the <u>Dekelwa</u> rule applies retrospectively, we need not definitively decide this question.

We also do not think that the fact that this Court in <u>Iron Workers, Local 3</u> applied the <u>Deklewa</u> rule retrospectively implies that <u>Beam</u> and <u>Harper</u> require this Court to apply it retrospectively again to this case.  There exists a substantial distinction between <u>Beam</u> and <u>Harper</u> on the one hand and <u>Iron Workers, Local 3</u> on the other, in that in <u>Iron Workers, Local 3</u> this Court deferred to the Board's revised construction of its organic statute; it did not construe the statute for itself.  <u>See</u> <u>Iron Workers, Local 3</u>, 843 F.2d at 776 (noting that while the Supreme Court had twice applied the pre-<u>Deklewa</u> rule, that rule was not <u>stare decisis</u> because the Court was merely reviewing the Board's interpretation and not announcing its own).  Were a court's application of law as proclaimed by an agency binding in subsequent cases before that court, agencies would effectively labor under the same stringent <u>stare decisis</u> doctrine which binds courts, and this has never been the case.  <u>See</u> <u>supra</u>.  To the extent that here the agency was exercising its legislative powers, moreover, <u>Iron Workers, Local 3</u> construed the law as expounded by the agency to be that the new rule applies lest manifest injustice would result.  We do not doubt that legislative rules may within bounds incorporate some forms of selective prospectivity.  <u>See</u>, <u>e.g.</u>, 28 U.S.C.A. § 2074(a) (Supp. 1993) (granting the Supreme Court the authority to fix the extent to which a newly promulgated rule of civil procedure or evidence shall apply to pending proceedings, but only "to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule . . . would not . . . work injustice"); <u>cf.</u> <u>Bradley v. School Bd.</u>, 416 U.S. 696, 716-21, 94 S. Ct. 2006, 2019-21 (1974) (determining whether retrospective application of a newly enacted procedural statute in that case would breed manifest injustice).

[0]The question whether in a particular instance the retrospective application by a district court of a rule of law announced in an

26

at 26-29. That court erred, however, when it departed from Chenery's "manifest injustice" analysis appropriate for agency adjudications and instead applied the three-prong Chevron Oil analysis once appropriate for judicial adjudications. See Chevron Oil v. Huson, 404 U.S. 97, 106-08, 92 S. Ct. 349, 355-56 (1971) (setting forth the test for retrospective application of new rules of law announced in "judicial decisions"). As we explained in Iron Workers, Local 3, while SEC v. Chenery Corp., 332 U.S. 194, 67 S. Ct. 1575 (1947) "has been applied exclusively to administrative agency adjudications," Chevron Oil "appears to have been applied exclusively to judicial adjudications." 843 F.2d at 780 n. 12. Thus, to the extent that the Chenery inquiry differs from the Chevron Oil test, the district court committed legal error.[0]

---

agency adjudication will cause manifest injustice is a question of law, not one of equity, notwithstanding the fact that some "equitable" considerations may play a role in the outcome. See In re Graham, 973 F.2d 1089, 1093 (3d Cir. 1992) (holding that we exercise plenary review over the district court's retrospective application of a Supreme Court decision); cf. Gruber v. Price Waterhouse, 911 F.2d 960, 965 (3d Cir. 1990) (deciding de novo whether a decision by this Court applied retrospectively); Gatto v. Meridian Medical Assocs., Inc., 882 F.2d 840, 842-44, (3d Cir. 1989) (same), cert. denied, 493 U.S. 1080, 110 S. Ct. 1136 (1990); Hill v. Equitable Trust Co., 851 F.2d 691, 696-99 (3d Cir. 1988) (same), cert. denied, 488 U.S. 1008, 109 S. Ct. 791 (1989); see also Iron Workers, Local 3, 843 F.2d at 780-81 (holding review of the Board's decision to apply a new rule of law retrospectively is deferential and that the Board's ruling will be disturbed only if it wreaks manifest injustice); Harper v. Virginia Dep't of Taxation, 113 S. Ct. 2510, 2516 n.9 (1993) (not deciding whether Chevron Oil v. Huson, 404 U.S. 97, 92 S. Ct. 349 (1971) was a "choice-of-law principle" or "a remedial principle for the exercise of equitable discretion"). A court of law is not blind to injustice. Hence although we pay deference to an agency's ruling on the retrospectivity of a rule it announces in an adjudication unless to do so would cause a manifest injustice, we apply plenary review to a district court's determination whether retrospective application of such a rule would indeed cause manifest injustice.

[0]In Iron Workers, Local 3 we mentioned the equivalency of the Chevron Oil and Chenery analyses on the facts then before us. See 843 F.2d

27

The numerous other courts to have considered the retrospectivity of the Deklewa rule have divided over the issue, with the slight majority of the cases not applying it

at 780 n.12 ("[O]n this record an independent analysis under either test would reach the same result here."). Given that the factors in Chevron Oil and Chenery vary in their emphasis, the same may not hold in all cases, and, in particular, it may be that the district court was correct when it decided that a Chevron Oil analysis would not countenance retrospective application of Deklewa to this case (although that is doubtful considering Iron Workers, Local 3).

The key discrepancy between the two inquiries is that, whereas Chevron Oil focuses on the reasonable expectations of the class of persons who will be adversely affected by retrospective application of the newly announced rule of law, Chenery concentrates on the actual reliance on the prior rule by the particular adversely affected party before the court. That means that the Chevron Oil analysis needs only be done once, in the decision first recognizing the new rule; by contrast, the Chenery analysis must be repeated in each case where the rule may be retrospectively applied.

This difference in application flows from the elemental dissimilarity between the two doctrines: Chevron Oil dealt with the question of pure prospectivity -- i.e., whether the rule should have future effect as to all parties, see Chevron Oil, 404 U.S. at 105-08, 92 S. Ct. at 355-56 (holding that the new rule of law "should not be applied retroactively in the present case"); cf. Beam, 111 S. Ct. at 2445 (plurality) (Souter, J.) ("selective prospectivity appears never to have been endorsed in the civil context"); id. at 2449 (White, J., concurring) -- whereas Chenery dealt with the question of selective prospectivity -- i.e., roughly, whether a rule otherwise applied retrospectively should not apply retrospectively to the particular parties before the court, see Chenery, 332 U.S. at 202-03, 67 S. Ct. at 1580-81; e.g., Ryan Heating Co. v. NLRB, 942 F.2d 1287, 1288-89 (8th Cir. 1991) (considering the adversely affected parties' actual reliance on the discarded rule); Fox Painting Co. v. NLRB, 919 F.2d 53, 56 (6th Cir. 1990) (same); Ballbe v. INS, 886 F.2d 306, 310 (11th Cir. 1989) (same), cert. denied, 495 U.S. 929, 110 S. Ct. 2166 (1990); Ewing v. NLRB, 861 F.2d 353, 362 (2d Cir. 1988) (same); Southwestern Public Serv. Co. v. FERC, 842 F.2d 1204, 1208-09 (10th Cir. 1988) (same); Oil, Chem. & Atomic Workers Int'l Union, Local 1-547 v. NLRB, 842 F.2d 1141, 1145 (9th Cir. 1988) (same); NLRB v. Wayne Transp., Div. of Wayne Corp., 776 F.2d 745, 751 n.8 (7th Cir. 1985) (same); NLRB v. Ensign Elec. Div. of Harvey Hubble, Inc., 767 F.2d 1100, 1102 n.2 (4th Cir. 1985) (same), cert. denied, 479 U.S. 984, 107 S. Ct. 573 (1986); McDonald v. Watt, 653 F.2d 1035, 1042-45 (5th Cir. Unit A Aug. 1981) (same); Standard Oil Co. v. Department of Energy, 596 F.2d 1029, 1063-65 (Temp. Emer. Ct. App. 1978) (same); Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C. Cir. 1972) (same).

retrospectively; the roster is set forth in the margin.[0] FWEC tries

[0] Compare NLRB v. Viola Indus.-Elevator Div., 979 F.2d 1384, 1396–97 (10th Cir. 1992) (applying Deklewa retrospectively) (using the "manifest injustice" standard and noting in passing that the union had achieved majority status prior to the employer's repudiation), Iron Workers, Local 3, 843 F.2d at 781 (same), NLRB v. Bufco Corp., 899 F.2d 608, 611–12 (7th Cir. 1990) (using the "manifest injustice" standard and relying on the union's attainment of majority status to find no manifest injustice), NLRB v. W.L. Miller Co., 871 F.2d 745, 748–50 (8th Cir. 1989) (same, but due to the Board's incredible delay finding manifest injustice with respect to the interest the Board assessed), appeal after remand, 988 F.2d 834 (8th Cir. 1993) (denying enforcement), R.W. Granger & Sons, Inc. v. Eastern Mass. Carpenters, 686 F. Supp. 22, 28–30 (D. Mass. 1988) (using the "manifest injustice" standard but finding none as a general matter because of the uncertainty prevailing under the old rule) and National Elevator Indus. Welfare Plan v. Viola Indus., Inc., 684 F. Supp. 1560, 1561, 1563 (D. Kan. 1987) (deferring to the Board's retrospectivity ruling without analysis although the union had failed to achieve majority status) with C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 357–59 (1st Cir. 1990) (not applying Deklewa retrospectively) (using the "manifest injustice" standard and finding manifest injustice because there was no evidence the union had achieved majority status, the dispute was purely historical, and application of the rule would disappoint reasonable private expectations and "penalize" the employer for having taken action lawful when taken), Fox Painting Co. v. NLRB, 919 F.2d 53, 56 (6th Cir. 1990) (using the "manifest injustice" standard and deferring to the Board's rule that it would not apply Deklewa retrospectively to cases where an appellate court had already affirmed a finding of liability before Deklewa was decided), United Bhd. of Carpenters & Joiners Local Union 953 v. Mar-Len of La., Inc., 906 F.2d 200, 203–04 (5th Cir. 1990) (applying the Chevron Oil factors and finding that the employer relied on the old rule when entering into the prehire agreement and when repudiating it, that the work on the site had been completed, and that there was no evidence the union had obtained majority status), Sheet Metal Workers Local Union No. 54 v. E.F. Etie Sheet Metal Co., 1 F.3d 1464, 1472 n.8 (5th Cir. 1993) (affirming Mar-Len of La., supra), cert. denied, 114 S. Ct. 1067 (1994), Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 895 F.2d 516, 518–19 & n.1 (9th Cir. 1989) (using the "manifest injustice" standard and applying the Chevron Oil analysis, finding that the employer had relied on the old rule when it repudiated the prehire agreement, that the dispute was "strictly historical," that there was no way to determine if the union had enjoyed majority support, and that retrospective application would "penalize" the employer for taking action possibly legal when taken), cert. denied, 498 U.S. 877, 111 S. Ct. 209 (1990), Camping Constr. Co. v. District Council of Iron Workers, 915 F.2d 1333, 1337 n.2 (9th Cir. 1990) (affirming Mesa Verde Constr. Co., supra), cert.

to distinguish the cases applying <u>Deklewa</u> retrospectively from those refusing to do so on the grounds that in all the former cases (i) the proceedings were pending in the Board at the time <u>Deklewa</u> was decided, and (ii) the employer effectively repudiated the agreement before <u>Deklewa</u> was decided. The district court tried to distinguish the cases on the basis of whether the union had clearly obtained majority status or not prior to the employer's repudiation of the prehire agreement. <u>See</u> Mem. Op. at 38. We think, however, that these attempts to reconcile the cases along the lines of one or another singular criterion must fail.

denied, 111 S. Ct. 1684 <u>and</u> 2260 (1991), <u>Trustees for Mich. Laborers Health Care Fund v. M.M. Vander Veen Constr. Co.</u>, 736 F. Supp. 138, 141–42 (W.D. Mich. 1989) (applying the <u>Chevron Oil</u> factors, finding actual reliance by the employer on the old law, and without explanation disagreeing with the Board that retrospective application of <u>Deklewa</u> would promote the purposes of the NLRA), <u>Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. American Automatic Fire Protection</u>, 680 F. Supp. 731, 734–35 (D. Md. 1988) (finding that the controversy was strictly historical, which means that, unlike in proceedings before the Board, the parties could not hold an election to test the union's majority status, and that applying the new rule would penalize the employer for taking action possibly legal when taken) <u>and</u> <u>Construction Indus. Welfare Fund of Rockford, Ill. v. Jones</u>, 672 F. Supp. 291, 293–94 (N.D. Ill. 1987) (using the "manifest injustice" standard and finding that the controversy was strictly historical, that the defendant actually relied on the old rule, and that application of the new rule would "effectively punish the [employer] for doing an act which was legally sanctioned at the time it was committed"). <u>But</u> <u>cf.</u> <u>Sheet Metal Workers, Local Union #312 v. Action Enters.</u>, 136 L.R.R.M. 2743, 2745 (D. Utah 1987) (relying on prior Tenth Circuit precedent adopting the <u>R.J. Smith</u> rule to reject <u>Deklewa</u> altogether).

Those courts applying <u>Deklewa</u> retrospectively in cases where the union had obtained majority status, especially where that factor was stressed, arguably did not truly apply the <u>Deklewa</u> rule retrospectively, as under the old <u>R.J. Smith</u> rule those courts would have reached the same result. Under the "conversion" doctrine of the <u>R.J. Smith</u> rule, once the union had obtained majority status, the pre-hire agreement became a collective bargaining agreement, and the employer was no longer free to repudiate the agreement at its pleasure.

First, not every court applies the same standard of review: some courts do not defer to the administrative agency's determination of retrospectivity at all, whereas this Court in Iron Workers, Local 3 held that it would follow the Board's retrospectivity ruling absent a manifest injustice. See NLRB v. W.L. Miller Co., 871 F.2d 745, 748 & n.2 (8th Cir. 1989) (noting the incongruity), appeal after remand, 988 F.2d 834 (8th Cir. 1993) (denying enforcement of the NLRB's order). Compare, e.g., Iron Workers, Local 3, 843 F.2d at 781 and C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 357 (1st Cir. 1990) with, e.g., Sheet Metal Workers Local Union No. 54 v. E.F. Etie Sheet Metal Co., 1 F.3d 1464, 1472 n.8 (5th Cir. 1993), cert. denied, 114 S. Ct. 1067 (1994) and Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers, 895 F.2d 516, 519 n.1 (9th Cir.), cert. denied, 498 U.S. 877, 111 S. Ct. 209 (1990).  Moreover, the fact that some recurring circumstances have been identified as rendering retrospective application of the Deklewa rule manifestly unjust does not dictate a similar result in other cases presenting a dissimilar coincidence of circumstances.  Finally, it appears that the courts are inconsistent and somewhat divided over the meaning and application of the "manifest injustice" doctrine.[0]

---

[0] FWEC also argues that the Board only intended retrospective application in cases pending before the agency, not those pending in federal courts.  See Construction Indus. Welfare Fund v. Jones, 672 F. Supp. 291, 293 (N.D. Ill. 1987).  In Deklewa, the Board was quoting from Deluxe Metal Furniture Co., 121 N.L.R.B. 995, 1006-07 (1958) when it determined to apply the new rule overruling R.J. Smith "`to all pending cases in whatever stage.'"  Deklewa, 282 N.L.R.B. at 1389.  The Board, citing administrative efficiency, had decided in Deluxe Metal Furniture that it would apply its new rule retrospectively "not only [to] the case in which such revisions are first announced and applied, but also [to] any other case which has not yet been decided, because it has not reached the Board's level

31

or is at one of the other stages of the administrative process such as the hearing." Id., 121 N.L.R.B. at 1006. The Board's reliance on Deluxe Metal Furniture, then, seems to indicate to FWEC that the Board meant the Deklewa rule to be applied retrospectively only to cases before the agency, not to those brought in the district courts under § 301 of the LMRA. Cf. Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. American Automatic Fire Protection, 680 F. Supp. 731, 734-35 (D. Md. 1988) (suggesting that a rule different from that applied by the Board in unfair labor practice proceedings under § 8(f) might apply in § 301 proceedings); Construction Indus. Welfare Fund of Rockford, Ill. v. Jones, 672 F. Supp. 291, 293 (N.D. Ill. 1987) (intimating the same).

We hesitate to read too much into the Board's circumspect retrospective application of its new rule, however, because we think perhaps the Board was only being politic when it chose not to direct federal courts as to which rule of law to apply. In our view, the retrospectivity standard should be the same whether the proceeding was initiated in a district court or the agency. The whole concept of a uniform national law is thwarted if the parties can select the substance of federal law by the simple expedient of forum shopping. Cf. Harper v. Virginia Dep't of Taxation, 113 S. Ct. 2510, 2516-17 (1993) (stressing equality of treatment and stating that the "`substantive law [cannot] shift and spring' according to `the particular equities of [individual parties'] claims'"); see also Erie R.R. Co. v. Tompkins, 304 U.S. 64, 74-78, 58 S. Ct. 817, 820-22 (1938) (stressing equality of the law). The defendants' rule would raise the spectre, too, that this Court would eventually be placed in the compromising and awkward position of applying two irreconcilable rules of law to the same transaction between the same parties, one upon appeal from a district court and the other upon appeal from the Board.

Furthermore, we do not wish thoughtlessly to set in motion a practice of interpreting statutes administered by dedicated agencies without affording the agency due deference simply because the initial forum was a federal district court rather than the agency. Not only would the practice unjustifiably undermine the effectiveness with which agencies may cultivate their organic statutes by adjudication instead of rulemaking, but the paramount rationales undergirding deference --agency expertise and congressional intent, see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45 104 S. Ct. 2778, 2782-83 (1984) -- are by no means less pressing when the action is initiated in a federal district court instead of a federal agency. When a federal agency pronounces a rule of law subject to stage two Chevron deference, see Chevron, 467 U.S. at 842-44 & n.9, 104 S. Ct. at 2781-82 & n.9 (Congress may impliedly or expressly delegate "authority to the agency to elucidate a specific provision of the statute by regulation"), assuming the construction is a permissible one, the pronouncement essentially defines what the federal law is, not merely what the agency considers it to be for its own purposes. See, e.g., Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565-70,

32

As mentioned above, the decision controlling retrospective application of a rule of law an agency promulgates in an adjudication and providing the benchmark for the "manifest injustice" inquiry remains <u>Chenery</u>. <u>Chenery</u> stated as the general rule that the ill effects of retrospectivity

> must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law.

<u>Chenery</u>, 332 U.S. at 203, 67 S. Ct. at 1581. This Court has not had many opportunities to apply <u>Chenery</u>, however, and indeed the only case we have found decided by this Court that discusses <u>Chenery</u> in a helpful way is <u>E.L. Wiegand Div. v. NLRB</u>, 650 F.2d 463 (3d Cir. 1981), <u>cert. denied</u>, 455 U.S. 939, 102 S. Ct. 1429 (1982).[0] There we referenced five factors announced by <u>Retail, Wholesale & Dep't Store Union v. NLRB</u>, 466 F.2d 380, 390 (D.C. Cir. 1972) to evaluate "whether the inequity of retroactive applications is counterbalanced

---

100 S. Ct. 790, 796–99 (1980) (deferring to the construction of the Federal Truth in Lending Act by the Federal Reserve Board's staff in a case originally brought in a district court).

[0]The reference to <u>NLRB v. Semco Printing Ctr., Inc.</u>, 721 F.2d 886, 892 (2d Cir. 1983) in <u>Iron Workers, Local 3</u>, <u>see</u> 843 F.2d at 780, was dicta and also, we think, not fully considered. <u>Semco Printing</u> relied on a line of cases considering retrospective legislative <u>lawmaking</u> or agency <u>rulemaking</u> of procedural rules, not retrospective agency <u>adjudication</u> of substantive rules. <u>See</u> <u>Bradley v. School Bd.</u>, 416 U.S. 696, 709–10, 94 S. Ct. 2006, 2015 (1974) (fee-shifting statute enacted by Congress); <u>Thorpe v. Housing Auth. of Durham</u>, 393 U.S. 268, 274–77, 89 S. Ct. 518, 522–23 (1969) (circular issued pursuant to agency's rulemaking powers); <u>Landgraf v. USI Film Prods.</u>, 62 U.S.L.W. 4255, 4264–66 (U.S. Apr. 26, 1994) (explaining that <u>Bradley</u> and <u>Thorpe</u> dealt with procedural rules and that legislation changing substantive rules has a different presumption regarding retrospectivity). We have no occasion to consider how retrospectivity differs between agency rulemaking and agency adjudication, if at all, but insofar as we have not ruled out the possibility that the standards may diverge somewhat, we think it prudent to draw on precedent dealing with adjudications.

by sufficiently significant statutory interests." E.L. Wiegand Div., 650 F.2d at 471. Although the factors could be characterized as dicta insofar as this Court never applied them in that case, they originate from the District of Columbia Circuit's landmark decision in Retail, Wholesale and appear to be in accord with other courts' interpretation of Chenery, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**, and thus we will adopt those five factors and apply them to this case.

The five factors we will consider are "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely occupies a void in an unsettled area of law, (3) the extent to which the party against whom the new holding is applied in fact relied on the former rule, (4) the degree of the burden imposed, and (5) the statutory interest in application of this new rule." E. L. Wiegand Div., 650 F.2d at 471 n.5. We determine that the first and fourth factors favor neither party, that the third and fifth factors militate in favor of the Union, and that the second factor favors the defendants. After going through a balancing operation, we conclude that Deklewa applies retrospectively to this case.[0]

Three of these factors can quickly be disposed of. First, as we are not newly announcing the Deklewa rule in this case, the

---

[0] In light of our resolution of the "manifest injustice" inquiry, we may disregard LIUNA's contention that FWEC and FWC are equitably estopped from complaining that retrospective application of Deklewa to this case would be manifestly unjust because of their deceptive conduct and their calculated failure to utilize MBTC's hiring hall. Br. of LIUNA at 25-29. We digress to observe, however, that it is far from clear that equitable principles apply to the "manifest injustice" choice-of-law inquiry. See supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**.

issue is not one of first impression.  If it were, we would be compelled either to apply the new rule retrospectively or to reject it, as the prohibition against advisory opinions, see Retail, Wholesale, 466 F.2d at 390; NLRB v. Majestic Weaving Co., 355 F.2d 854, 860 (2d Cir. 1966), assures that "[e]very case of first impression has a retroactive effect," Chenery, 332 U.S. at 203, 67 S. Ct. at 1581.  Subsequent cases, on the other hand, do not always demand retrospective application of the "new" rule (we speak now only of agency adjudications).  See supra at **Error! Bookmark not defined**. n.**Error! Bookmark not defined**..  Second, as all agree, the rule "represents an abrupt departure from well-established precedent."  This fact cuts against retrospective operation, since the parties' reliance interests will more likely be disappointed.  Third, the Board found, and this Court in Iron Workers, Local 3 concurred, that there was a great statutory interest in the retrospective application of Deklewa, even in cases (like Deklewa itself) where the dispute was purely of historical interest.[0]  This factor accordingly weighs in on the side of retrospectivity.

---

[0]We are not unaware of the fact that many courts have stressed that applying Deklewa retrospectively to a dispute of purely historical interest does not further the interests which the new rule was fashioned to advance, namely, labor stability and employee freedom of choice, see Iron Workers, Local 3, 843 F.2d at 780-81.  See United Bhd. of Carpenters & Joiners Local Union 953 v. Mar-Len of La., Inc., 906 F.2d 200, 203, 204 n.4 (5th Cir. 1990); Mesa Verde Constr., 895 F.2d at 519; Trustees for Mich. Laborers Health Care Fund v. M.M. Vander Veen Constr. Co., 736 F. Supp. 138, 142 (W.D. Mich. 1989); Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. American Automatic Fire Protection, 680 F. Supp. 731, 735 (D. Md. 1988).  But we have already held in a case which was only of historical interest that Deklewa applies restrospectively without being moved by that fact, see Iron Workers, Local 3, 843 F.2d at 772, 780-81; Deklewa, 282 N.L.R.B. at 1376, 1385 n.40, 1386, 1389, and under our Internal Operating Procedure 9.1 we are not competent to retreat from that position even if we were inclined to do so.

As to the question of the substantiality of the burden, the record is unclear. The parties stipulated that if FWEC's breach of the Agreement dated only from April to June 1985, LIUNA's damages would come in under $20,000, almost a trifling sum in this context even when compared just to the costs and fees presumably expended in this 8-year litigation. If the period of the breach is extended to July 1986, the damages may not be disproportionately larger, although under some remedial theories advanced by LIUNA at oral argument, ones obviously different from those upon which the $20,000 calculation was premised, the damages might grow substantially.[0] Counterbalancing this fact is the defendants' great size and considerable wealth, as financial fortitude blunts the blow of damages. In sum, this inconclusive factor might favor either side.

Finally, as to the weighty factor of actual reliance by the adversely affected party, the record convincingly establishes that there was no actual reliance by the defendants on the superseded rule. While true that an abrupt about-face in the law (the second factor) "strongly advises" the conclusion of an "inequitable result" under the inapposite Chevron analysis, Gruber v. Price Waterhouse, 911 F.2d 960, 968 (3d Cir. 1990), this Chenery actual reliance factor spotlights the subjective question whether the party opposing retrospective application did, in fact, rely upon the retracted rule, rather than the objective question whether that

---

[0]LIUNA orally argued that it might be entitled to recover the full amount of salary lost by (presumably identified) workers who desired employment at the MOEPSI project, regardless of mitigation of damages. The defendants rejoin that this position is preposterous. Neither party cites any authority on the point, but that is of little concern to us, as the fashioning of remedies for breach of a prehire agreement is, as we explain below at 56, suited especially for the experience and expertise of a labor arbitrator.

party reasonably and justifiably could have relied upon it, <u>see</u> <u>supra</u> at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**; <u>see also</u> <u>infra</u> at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**.

The district court found that "the defendants tried to deceive the union about the applicability of the [Agreement] to the MOEPSI project for a long time," Mem. Op. at 37, which strongly suggests that the defendants themselves felt bound by the Agreement at that site.[0] In essence, they perpetrated the deception by pretending that the nominal contractor FWIC was the prime contractor on the project.[0] Furthermore, the district court found that "the defendants initially believed they could not repudiate the agreement

---

[0]The court determined in this regard:

> [A]s part of their effort to support their claims that the National Agreement did not apply to EPC or the MOEPSI project, I find the defendants worked to conceal the ample evidence of FWEC's extensive involvement in the bidding process and in MOEPSI's project management. For instance, during the bidding process, FWEC officials and employees used FWIC's letterhead to communicate with [MOEPSI]. Similarly, although FWEC employees actually prepared the bid and Mr. Sarappo suggested conducting the project management from FWEC's headquarters at the Houston Engineering Center, FWIC and later EPC were technically designated as MOEPSI's project managers. These actions and the others detailed in the findings of fact convince this court that the defendants not only failed to repudiate the National Agreement prior to June 3, 1985 but that they actively deceived LIUNA regarding its applicability.

Mem. Op. at 44.

[0]FWEC attempts to deride the district court's finding of deception by focusing on the fact that EPC was openly and notoriously non-union. <u>See</u> Br. of FWEC at 29-31. But the trial court's finding was predicated on FWEC's surreptitious use of FWIC as a surrogate contractor and its subsequent misidentification of EPC as the prime contractor rather than as the subcontractor, not on any action taken by EPC to conceal the fact that it ran an open shop.

for a single project and that they did not want to repudiate the agreement as a whole," seemingly because they wished to reap the rewards of the Agreement in other regions of the country where union influence was stronger. Mem. Op. at 32.

The defendants' initial belief was justified until they learned about Painters Local Union No. 64 of Brotherhood of Painters v. Epley, 764 F.2d 1509 (11th Cir. 1985), cert. denied, 475 U.S. 1120, 106 S. Ct. 1636 (1986), in which the Eleventh Circuit held that an employer could repudiate an area-wide prehire agreement with respect to a particular job site without affecting the agreement at other job sites. Undoubtedly the defendants' early belief that they could not selectively repudiate the Agreement with regard to a particular site accounts for the deception noted above. But Epley was handed down on July 12, 1985 (the district court found that FWEC explicitly repudiated the Agreement as to the MOEPSI site alone on August 9, 1985), months after the defendants had fully committed themselves, both internally and contractually, to use non-union labor, and saddled themselves with that obligation by opening their own hiring hall (in January 1985) and hiring their workers from there (commencing on April 2, 1985) instead of from MBTC's hiring hall. See supra at 10.

Given this state of affairs, we do not see how, measured from the moment the defendants reached their decision to "repudiate" the Agreement (which we think happened at the time FWEC decided to use FWIC as the nominal contractor, sometime before February 1984, see supra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**), they possibly could have relied on their as of yet

38

unestablished right to repudiate the Agreement selectively with respect to a single job site.[0]  Rather, it is abundantly clear from the measures they undertook to conceal FWEC's involvement in the project that they in fact believed they had no such right.  In short, we are persuaded that had <u>Deklewa</u> been decided and entrenched long before the defendants ever heard of the MOEPSI project, neither FWEC nor FWC would have behaved any differently.  At all events, in February 1984 -- the date, as noted above, when the defendants chose to bypass the Agreement at the MOEPSI site -- the defendants could not have been very confident that LIUNA would not enjoy majority support at the MOEPSI site.  <u>See</u> <u>supra</u> at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.** (discussing the implications of a union obtaining majority status).

We turn now to the balancing exercise.  We bear in mind the backdrop that "when the Board changes a rule and makes it retroactive, particularly when the Board assigns as its reasons for doing so the furtherance of the fundamental statutory policies of employee free choice and labor relations stability, the Board should be entitled to exercise its broadest power."  <u>Iron Workers, Local 3</u>, 843 F.2d at 780. We are also reminded of the truism that in the context of adjudication, retrospectivity is, and has since the birth of this nation been, the norm.  <u>See</u>, <u>e.g.</u>, <u>Harper v. Virginia Dep't of Taxation</u>, 113 S. Ct. 2510, 2516 (1993); <u>cf.</u> <u>Hill v. Equitable</u>

---

[0]Even in its brief before this Court, neither FWEC nor FWC cites a case predating <u>Epley</u> which approved of a single-site repudiation, and our own research has shown <u>Epley</u> to be a ground-breaking case. <u>See</u>, <u>e.g.</u>, <u>New Mex. Dist. Council of Carpenters & Joiners v. Jordan & Nobles Constr. Co.</u>, 802 F.2d 1253, 1255-56 (10th Cir. 1986); <u>Trustess for Mich. Laborers Health Care Fund v. M.M. Vander Veen Constr. Co.</u>, 736 F. Supp. 138, 143-44 (W.D. Mich. 1989).

<u>Trust Co.</u>, 851 F.2d 691, 695-96 (3d Cir. 1988) (discussing the competing views on retrospectivity), <u>cert. denied</u>, 488 U.S. 1008, 109 S. Ct. 791 (1989).

Although retrospectivity is not mandated, as this case is not one of first impression, the sole factor opposing retrospectivity is the fact that the rule signalled an abrupt departure from prior precedent. But this factor itself was considered in <u>Deklewa</u> and, on appeal, in <u>Iron Workers, Local 3</u>, and neither tribunal found it defeated retrospective application of the <u>Deklewa</u> rule then.[0]

---

[0]The Board in <u>Deklewa</u> abstractly addressed the reliance interest in the old rule as follows:

> Some employers probably have relied on <u>R.J. Smith</u> as a means of repudiating a prehire agreement. However, that reliance interest is not a particularly strong one in light of the purposes that Congress sought to achieve under Sec. 8(f). The interest that is entitled to protection is the ability of an employer to avail itself of the Board processes to determine whether there is continued majority support to undergird the union and the agreement. The new rule, which affirms the Board's election procedures for resolving that issue, does not seriously detract from what an employer should appropriately expect in the way of protection under the old rule.

282 N.L.R.B. at 1389 n.61. The Board is correct that generally an employer could not reasonably rely on a right of repudiation that was contingent on the union not acquiring majority status, but there may be an exception if the employer was realistically confident that the union would not obtain majority status. For this reason we have focused on the particular evidence of lack of reliance in this case.

It may well be true that the repudiator's reliance interest is less compelling when the case is still pending before the Board, since then the Board could perhaps conduct an election "to test the union's majority status." <u>Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund v. American Automatic Fire Protection</u>, 680 F. Supp. 731, 735 (D. Md. 1988). But the Board has applied <u>Deklewa</u> retrospectively, found the employer guilty of an unfair labor practice, and ordered appropriate remedies without first holding an election. <u>See</u>, <u>e.g.</u>, <u>MIS, Inc.</u>, 289 N.L.R.B. No. 62 (1988) (ordering an employer to make its employees whole but not scheduling an election). Moreover, contrasting the sluggish rate at which the Board's bureaucratic wheels sometimes rotate with the

Indeed, defendants have not in fact relied to their detriment upon the discarded rule, a factor of primary importance. Moreover, we held in Iron Workers, Local 3 that the statutory interest in application of the new rule is substantial. Finally, the burden the defendants might bear does not look to be disproportionately large given their means. In view of the foregoing, we conclude that the factors strongly weigh in favor of retrospective application of the Deklewa rule to this case.[o]

---

rapid turnaround prevalent in the construction industry convinces us that even in cases pending before the Board an election will quite often be impracticable. For example, in this case the Board had to dismiss a petition for election when the sizable MOEPSI project terminated before the election could be held. In any event, we agreed with the Board in Iron Workers, Local 3, see 843 F.2d at 781, so the issue is water over the dam.

[o]Because of this disposition we are not called upon to reach the question whether the defendants were precluded from repudiating the Agreement at their pleasure for purposes of an action under § 301 notwithstanding the fact that under the R.J. Smith rule it would not have been an unfair labor practice for them to do so. That is to say, merely because repudiation would not have been an unfair labor practice under R.J. Smith would by no means have been conclusive as to whether or not the repudiator would have breached the pre-hire agreement and the other party would be entitled to damages. The parties have approached and argued this case as if the issue of whether the Board would consider repudiation an unfair labor practice were dispositive of whether there was a breach of the § 8(f) prehire agreement, and consequently whether the other party could recoup damages for said breach. Such assumption was unwise. See, e.g., Jim McNeff, Inc. v. Todd, 461 U.S. 260, 267, 103 S. Ct. 1753, 1757 (1980) (differentiating between duties under the NLRA and "contractual obligations that accrued" under a prehire agreement).

   Although some language in Jim McNeff may have led the parties to believe that to be the proper strategy, the Supreme Court there expressly declined to address whether valid § 8(f) repudiations under the NLRA are also valid for § 301 purposes. See 461 U.S. at 271 n.13, 103 S. Ct. at 1759 n.13. Because of our resolution of the Deklewa issue, we easily conclude, however, that FWEC was not at liberty to repudiate the Agreement. We do not decide, as we need not, whether our decision as to the continued vitality of the Agreement for purposes of § 301 would have been different had we concluded that the defendants validly repudiated the Agreement for purposes of an unfair labor practice charge before the Board.

41

The consequence of our conclusion that <u>Deklewa</u> applies retrospectively is that the Agreement at the MOEPSI site was never repudiated by the defendants until they rightfully terminated it effective July 15, 1986. Under <u>Deklewa</u>, an employer cannot repudiate a prehire agreement unless the Board first conducts an election decertifying the union. <u>See</u> 282 N.L.R.B. at 1385. The facts indicate that no effective election was ever held (the NLRB did conduct an election, but on appeal from the election petition the ballots were impounded and by the time the Board remanded the matter the election had been mooted). <u>See</u> <u>supra</u> at **Error! Bookmark not defined**. n.**Error! Bookmark not defined**.. Thus, the parties continued to be bound by the Agreement at the MOEPSI site until July 15, 1986, when FWEC within the window provided therefor properly terminated the Agreement in its entirety.[o]

### III. THE EFFECT OF THIS COURT'S MANDATE ON THE ARIBTRATOR'S FACTUAL FINDNGS

The arbitrator made several findings of fact in his arbitration decision, a decision which preceded the parties' second appeal to this Court. The two important facts found by the arbitrator were that (i) FWEC and EPC were a "single employer," and (ii) FWEC was the prime contractor at the MOEPSI site, contrary representations in the paper trail notwithstanding. The district

---

[o]The parties expend much effort debating the precise date of each defendant's supposed repudiation of the Agreement. <u>See</u>, <u>e.g.</u>, Br. of FWC at 38–48; Br. of FWEC at 35–42; Reply Br. of LIUNA at 33–39; Reply Br. of FWC at 21–23; Reply Br. of FWEC at 10–16. Since we conclude that <u>Deklewa</u> operates retrospectively to this case, the issue of what constitutes a repudiation is mooted.

     This disposition also allows us to avoid the question whether as a matter of choice of law we would need to apply the law of the Eleventh Circuit as defined by <u>Epley</u>, 764 F.2d at 1513–14 to the issue of repudiation.

court adopted those findings as its own, but then the parties appealed to this court, disputing the legality of the district court's arbitration order. On appeal we vacated some, but not all, of the district court's orders subsequent to the arbitration order. See supra at 48; infra at 48. Upon remand, the district court concluded that we had vacated all of its post-arbitration orders, including the one adopting some of the arbitrator's facts as its own.

The parties now dispute whether those findings survived our vacatur of portions of the district court's orders linked to the arbitration. The employers argue that our prior decision vacated the district court's entire order, including those factual findings; the union, conversely, maintains that those factual determinations survived and are now the law of the case. Because the answer lies in this Court's prior opinion in this case, we are called upon to interpret it.

On December 9, 1985, the district court ordered the defendants to "participate in an arbitration of the Plaintiff's grievance concerning the applicability of Section 1 of the parties' National Agreement [(Scope)] to the construction project." Order at 1-2. The court in its accompanying decision explained this order:

> I warn the parties not to attempt to confuse the narrow question I have found arbitrable with other issues such as majority representation, bargaining units and repudiation. Before anything else is to be determined in this suit, the threshold issue of whether the Section 8(f) agreement applies must be determined.

Mem. Op. at 19 (Dec. 9, 1985). After a hotly contested arbitration --the arbitrator conducted three days of hearings, reviewed 192 exhibits, and considered 299 pages of briefs -- Arbitrator Kagel

43

concluded, inter alia, that (1) FWEC and FWC were alter egos; (2) EPC was a joint or single employer with FWEC; (3) EPC had been listed as the prime contractor on the MOEPSI site only to dupe LIUNA and that FWEC was the actual prime contractor; and (4) the Agreement obligated FWC and FWEC to apply its terms to the MOEPSI project. Mem. Op. at 2; see Op. & Dec. at 33–35 (Kagel, Arb.) (Nov. 10, 1986).

One year later, the district court partially granted plaintiff's motion to confirm the arbitrator's award. Order at 1 (Nov. 17, 1987). In its opinion, the court explained that the arbitrator's conclusion that FWC and FWEC breached the Agreement (derived from finding (4), supra), went beyond the scope of its reference and hence it would not defer to that finding, but it let stand his other conclusions. Mem. Op. at 7–10 ("Aside from his final conclusion regarding breach, the arbitrator's decision falls within the four corners of my intended submission.").

LIUNA now claims that FWEC in its earlier appeal to this Court argued only that Deklewa should not be applied retrospectively[0] and that it had repudiated the Agreement on or before June 6, 1985, but did not attack finding (2) (to the effect that EPC and FWEC were a joint employer) or finding (3) (to the effect that FWEC was actually the prime contractor on the MOEPSI site), and submits that therefore both the findings became res judicata.[0] Assuming arguendo

---

[0] On the parties' prior successful appeal we did not resolve that question, remanding the issue instead for the district court to reconsider in light of Iron Workers, Local 3. See Laborer's Int'l Union, 868 F.2d at 577.

[0] Assuming the validity of its premise that the defendants did not attack the entire judgment on their previous appeal, LIUNA appears to be correct on the res judicata point:

44

that the defendants appealed from the district court's entire judgment rather than simply from some subset of issues, the decision would have established the law of the case solely with respect to those issues the decision reached explicitly or by necessary inference.

The parties did not include the initial notice of appeal in the record, and neither FWEC nor FWC asserts that it noticed its appeal from the entire judgment in its 1988 cross-appeal. Nonethe-

> If an appeal is taken from only part of the judgment, the remaining part is res judicata, and the vacation of the portion appealed from and remand of the case for further proceedings does not revive the trial court jurisdiction of the unappealed portion of the judgment.

1B JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 0.404[4.-3], at II-17 (2d ed. 1993); see Habecker v. Clark Equip. Co., 942 F.2d 210, 218 (3d Cir. 1991) (stating that a district court may enter any order or reach any decision so long as it was neither disposed of by an earlier district court order and not pursued on appeal, nor disposed of by the appellate court's mandate in the earlier appeal); Seese v. Volkswagenwerk, A.G., 679 F.2d 336, 337 (3d Cir. 1982) (per curiam) ("The district court is without jurisdiction to alter the mandate of this court on the basis of matters included or includable in defendants' prior appeal." (emphasis added)); Aubrey v. Director, Office of Worker's Compensation Programs, 916 F.2d 451, 456 (8th Cir. 1990) ("failure to cross-appeal prohibits an appellee from attempting to enlarge her rights or to lessen her adversary's rights" upon remand (citing cases)); Payne v. Travenol Lab., Inc., 673 F.2d 798, 816 & n.24 (5th Cir.), cert. denied, 459 U.S. 1038, 103 S. Ct. 451 (1982). But if the appeal stems from the entire judgment and the judgment is reversed or vacated and the case remanded generally for further proceedings, the district court, barring some narrow exceptions finding no application here, must apply the mandate as established explicitly or by necessary inference by the appellate court (though it is free to reconsider other issues). See, e.g., United States v. Kikumura, 947 F.2d 72, 76 (3d Cir. 1991); Day v. Moscow, 955 F.2d 807, 812 (2d Cir.), cert. denied, 113 S. Ct. 71 (1992); 1B MOORE ET. AL., MOORE'S FEDERAL PRACTICE ¶ 0.404[4.-3], at II-17; id. ¶ 0.404[10]; 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478, at 792-94 (1981); cf. In re Resyn Corp. (Resyn Corp. v. United States), 945 F.2d 1279, 1281-82 (3d Cir. 1991) (holding that issues raised but not reached on a prior appeal are not within the law of the case doctrine); Elias v. Ford Motor Co., 734 F.2d 463, 465 (1st Cir. 1984) (affirmance).

45

less, because it is not outcome-determinative, we will give the defendants the benefit of the doubt and assume that they noticed their appeal from the entire judgment. The defendants' case falters because (1) in their briefs on the earlier appeal they did not actually attack the district court's adoption of the arbitrator's factual findings; (2) this Court did not expressly or by necessary implication reverse the district court's earlier validation of the arbitrator's two factual findings; and (3) this Court did not vacate that portion of the district court's order adopting the factual findings. Consequently, the two findings became res judicata after the remand -- hence, absent certain extraordinary circumstances, they were beyond the authority of the district court to revisit.

In the Statement of Issues in its 1988 appellate brief, FWEC posed the question "[w]hether the District Court erred in compelling Arbitration on any issue and in later failing to set aside the arbitrator's decision in its entirety." 1988 Br. of FWEC at 2 (emphasis added). But beyond that brief reference it never mentioned or developed that issue in its argument section. In fact, after asserting in a conclusory fashion that it could establish that the district court should have vacated the arbitrator's decision, FWEC stated that it "will not, however, address these issues herein because, although it would result in a reduction or total vacation of damages, it would require remand and trial and/or another arbitration which would serve only to prolong a small dispute which has been out of control for much too long." Id. at 5 (Statement of the Case).

46

To complicate matters, though, FWEC followed its disclaimer with the declaration that it would "adopt[] those arguments of . . . FWC which establish why the arbitrator exceeded his jurisdiction, why the District Court's refusal to overturn the Arbitrator's decision should be vacated and why the court's order compelling arbitration should be overturned." Id. at 5-6; see FED. R. APP. P. 28(i) ("In cases involving more than one appellant or appellee, . . . any appellant or appellee may adopt by reference any part of the brief of another."). However, a perusal of FWC's 1988 brief finds no argument that helps FWEC.[0]

LIUNA concedes that FWEC addressed the arbitration issue in its 1988 reply brief (which was not placed in the record), see Reply & Opp'n Br. of LIUNA at 31, but argues that by then it was too late to do so. We agree. An issue is waived unless a party raises it in its opening brief, and for those purposes "a passing reference to an issue . . . will not suffice to bring that issue before this court." Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion) (Becker, J.), cert. denied, 112 S. Ct. 1671 (1992); International Raw Materials v. Stauffer Chem. Co.,

---

[0] FWC raised four issues on appeal. First, it argued that the district court improperly compelled it (FWC) to submit to arbitration since it was not a signatory to the Agreement; FWEC being a signatory, the argument did not pertain to it. 1988 Br. of FWC at 14-24. Second, it argued that if it were bound by the Agreement, then FWEC's and EPC's repudiations were effective as to it too. Id. at 25-31. Third, FWC did argue that the arbitrator's award should be set aside, but it did not challenge the arbitrator's factual filings, restricting itself to arguing that the arbitrator erred in considering "external law" when he construed the Agreement. Id. at 31-34. Although FWC prayed for relief that the entire arbitration award be vacated, it advanced no arguments addressing why the factual findings in particular should have been vacated. Fourth, FWC argued Deklewa should not be retrospectively applied to this case. Id. at 34-40.

47

978 F.2d 1318, 1327 n.11 (3d Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1588 (1993).  Accordingly, unless the 1989 decision reversed that portion of the district court's order affirming the arbitrator's findings of fact or vacated the corresponding portion of its order, FWEC's failure to contest those points on appeal renders them <u>res judicata</u>.  See <u>supra</u> at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**

Nowhere did the 1989 decision reverse the district court's order adopting the facts, although it did vacate the district court's orders "predicated on the assumption that FWEC was FWC's alter ego." <u>Laborer's Int'l Union</u>, 868 F.2d at 577.  We conclude that the 1989 decision did not vacate the district court's ratification of the arbitrator's two findings of fact (which had to do with FWEC and <u>EPC</u>'s relationship) because that portion of the district court's order was the <u>only</u> portion of the order which both was not predicated on the alter ego finding and remained contested.[0]

---

[0] The district court issued three "subsequent orders."  First, the district court denied defendants' motion to vacate the arbitration decision and granted plaintiff's motion to affirm it except insofar as the arbitrator found that the defendants breached the Agreement. As should be clear, while some of the arbitration decision was predicated on the assumption that FWEC was FWC's alter ego, see 868 F.2d at 577, the two factual findings at issue which the court had embraced were not, as they dealt exclusively with the relationship obtaining between FWEC and EPC.  Second, the court denied defendants' motion for summary judgment and partially granted plaintiff's motion for summary judgment. This order was obviously predicated on the defendants' alter ego status, hence it was vacated.  Third, the court ordered the parties to stipulate to damages within 60 days or the court would hold a further hearing to "determine the appropriate forum and procedure by which said issue may be resolved."  Order at 1-2.  Because the parties stipulated to damages prior to taking the 1989 appeal, this order had already been rendered moot.  Thus, by necessary implication, the district court's confirmation of the arbitrator's two factual findings must have been the portion of the district court's "subsequent orders" which this Court did not vacate.

We hesitate to construe a carefully crafted vacatur as having vacated the entire matter under review. This interpretation is reinforced by the absence of any reason this Court would have had for vacating those particular factual findings and requiring a duplication of effort: FWEC was properly compelled to arbitrate those factual issues, and an arbitrator eventually would have needed to resolve them anyway to settle FWEC's liability.

Nevertheless, the district court interpreted this Court's 1988 mandate to vacate all of the arbitrator's factual findings. Mem. Op. at 5 n.3. Therefore, the court decided to "review this matter afresh." Id. Unfortunately, that alternative route ignores the fact that the parties had contractually agreed to have exactly these questions answered by an arbitrator. The moment FWC conceded that it was FWEC's alter ego, the central question whether it could be compelled to arbitrate the dispute was affirmatively answered, and the district court should thereupon have dispatched the parties to arbitration as soon as it determined the effective repudiation/termination date of the Agreement. See infra at **Error! Bookmark not defined.** n.**Error! Bookmark not defined.**.

In any event, we believe that the district court miscon-strued this Court's mandate. Even if this Court meant to vacate the order compelling FWEC (as opposed to FWC) to submit to arbitration, an issue which was not presented to this Court,[0] as stated above, we

---

[0]This Court vacated the arbitration order because the district court, not the arbitrator, was to decide whether FWC was bound by the Agreement, since if it were not bound, it could not be commanded to submit to arbitration. See 868 F.2d at 576–77. The reason is straightforward: a party cannot be compelled to arbitrate the arbitrability issue. See, e.g., Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 111 S. Ct. 2215, 2226 (1991). As a signatory to the Agreement, FWEC was unquestionably obligated to arbitrate the

did not vacate the district court's subsequent confirmation of the arbitrator's factual findings. Accordingly, the arbitrator's findings once adopted by the district court, namely, that FWEC and EPC were a single employer and that FWEC was really the prime contractor at the MOEPSI site, are res judicata, and the district court should not have revisited them.

IV. THE ARBITRABILITY OF THE ISSUES OF BREACH AND DAMAGES

A. Introduction

Where no factual determinations are involved, this Court reviews the district court's decision to send the issues of damages and breach to arbitration as a matter of law. See Sheet Metal Workers Int'l Ass'n, Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1278-79 (3d Cir. 1991) ("We have plenary review on whether the terms of the collective bargaining agreements are ambiguous. Moreover, we review de novo the district court's construction of the collective bargaining agreements, which is a question of law." (citation omitted)); cf. Lukens Steel Co. v. United Steelworkers, 989 F.2d 668, 672 (3d Cir. 1993) (where a collective bargaining agreement is ambiguous and the parties' intent is controlling, the scope of review is for clear error). See generally Ram Constr. Co. v. American States Ins. Co., 749 F.2d 1049, 1052-53 (3d Cir. 1984) (comparing when plenary and clear error review is appropriate). Our primary guide is the strong federal labor policy favoring arbitration, a policy in large part premised on the arbitrator's superior

---

dispute. FWC, on the other hand, was not a signatory thereto, and hence the court could direct it to arbitration only if the court first determined that somehow FWC had become bound by the Agreement.

expertise in the mechanics of collective bargaining and collective bargaining agreements, greater understanding of the law of the shop, and greater efficiency in resolving labor disputes. See Luden's Inc. v. Bakery, Confectionery & Tobacco Worker's Int'l Union Local 6, -- F.3d --, -- (3d Cir. 1994).

The parties inserted an extremely capacious arbitration clause into the Agreement:  it provided that "all grievances and disputes [over the application or interpretation of this Agreement], excluding jurisdictional disputes, shall be handled as hereinafter provided."[0]  Agreement art. XV.  Given the jurisprudence in this area, see, e.g., A T & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (1986) ("`[An] order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" (quoting United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582-83, 80 S. Ct. 1347, 1352-53 (1960))), neither defendant could plausibly argue that such an inclusive arbitration clause can be read to exclude a dispute over whether the agreement applies to a certain work site or not, and neither does.

B.  The Enforceability of Arbitration Clauses in Prehire Agreements

---

[0]A jurisdictional dispute in this context signifies not a dispute over the application of the Agreement to a specific construction site, but rather a dispute over the proper labor organization to be assigned a given job. See id. art. XIV. See generally II Charles J. Morris, The Developing Labor Law, at 1366-98 (3d ed. Patrick Hardin ed. 1992).

Defendants do argue that prehire agreements are not subject to arbitration and attempt to anchor this innovative argument in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 103 S. Ct. 1753 (1983). In Jim McNeff a union brought suit under § 301 of the LMRA, 29 U.S.C.A. § 185 (1978), complaining that the employer had breached a prehire agreement by failing to make contributions to the union's fringe benefit trust fund. The Court made no mention of an arbitration clause, but alluded to the "critical distinction between an employer's obligation under the [NLRA] to bargain with the representative of the majority of its employees and its duty to satisfy lawful contractual obligations that accrued after it enters a prehire contract." Jim McNeff, 461 U.S. at 267, 103 S. Ct. at 1757. Thus, the Court held that while an employer must not bargain with the union before the union obtains majority status, the conditions of § 9(a) of the NLRA not having been fulfilled, when a union and employer enter into a prehire agreement, "both parties must abide by its terms until it is repudiated." Id. at 271, 103 S. Ct. at 1759. We note that Jim McNeff predated Deklewa, and thus at the time either party could have unilaterally repudiated a prehire agreement without contravening the NLRA (that is, the R.J. Smith rule was then in effect). Ibid.

The defendants maintain that McNeff implies quite the opposite of what it says. They urge that a signatory to a prehire agreement containing an arbitration clause cannot be compelled to arbitrate until the § 8(f) prehire agreement has been transmogrified into a § 9(a) collective bargaining agreement. Br. of FWEC at 48–49. Without giving any reason for so doing, the defendants attempt

52

to confine Jim McNeff to its narrow holding that "the monetary obligations assumed by an employer under a prehire contract may be recovered in a § 301 action brought by a union prior to the repudiation of the contract, even though the union has not attained majority support in the relevant unit." Id. at 271-72, 103 S. Ct. at 1759. Based on this niggardly understanding of Jim McNeff, they contend that LIUNA is limited to recovering damages in the district court. But clearly their reading of Jim McNeff misses its essential point that the terms of an operative prehire agreement are enforceable despite the union's lack of majority status. The Court analyzed the statutory text and purposes of § 8(f) to arrive at this preeminently logical conclusion.

FWEC additionally attempts to distinguish Jim McNeff on the ground that here FWEC repudiated the Agreement before LIUNA sought arbitration, whereas in Jim McNeff the prehire agreement remained in effect throughout the litigation. Reply Br. of FWEC at 18. But even if that distinction could hold water, which it cannot, see Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 111 S. Ct. 2215, 2225 (1991) (holding that a postexpiration grievance is subject to arbitration if the grievance "involves facts and occurrences that arose before expiration"); Nolde Bros., Inc. v. Bakery & Confectionary Workers Union, 430 U.S. 243, 255, 97 S. Ct. 1067, 1074 (1977) ("the parties' failure to exclude from arbitrability contract disputes arising after termination . . . affords a basis for concluding that they intended to arbitrate all grievances arising out of the contractual relationship"), the retrospectivity analysis we engaged in eliminates that distinction: since Deklewa

53

applies retrospectively, the parties continued to be bound by the Agreement at the MOEPSI site until FWEC terminated it effective July 15, 1986, a long time ago but still almost a full year after LIUNA instituted this action to compel arbitration.

### C. Relevancy of the Merits of the Dispute

The defendants also argue that arbitration is improper in this case in particular because no damages can flow from a finding they breached the Agreement, as LIUNA operated an illegal hiring hall. They are correct that discriminatory hiring halls are probably illegal, e.g., NLRB v. International Bhd. of Elec. Workers Local 322, 597 F.2d 1326, 1330 (10th Cir. 1979), that they apparently violate the Agreement, see Agreement art. V §§ 1-2, that the district court found the local hiring hall to be run in a discriminatory fashion, see Mem. Op. at 18 n.6, and, the local union having been under LIUNA's trusteeship since May 1984, that LIUNA cannot distance itself from the illegal conduct. Thus it may very well be true that LIUNA is entitled to no damages.[0]

We cannot be certain of that, however, as the correct answer completely depends on the interpretation to be given the Agreement. Because it appears that neither defendant in fact suspected that the union hiring hall was being run illegally until well after the filing of the complaint in this case, and because of the defendants' deception described earlier, the arbitrator may have to name a winner in the battle of the unclean hands. It may also be

---

[0] However, if LIUNA may recover damages on behalf of its injured membership, this equitable defense may not aid defendants with respect to LIUNA's membership, even if dispositive vis-à-vis LIUNA.

that, insofar as FWEC never attempted to invoke the Agreement and make use of MBTC's hiring hall (i.e., insofar as FWEC never tendered performance), it cannot establish LIUNA even breached, much less materially breached, the Agreement by not having a non-discriminatory hiring hall available for its use.

The arbitrator may also deem it possible that, had FWEC requested referrals from MBTC's hiring hall, the hall would have ceased its illicit ways and changed its procedures to bring the local into compliance with the Agreement and the law. That is, LIUNA's illegal operation of a hiring hall with respect to other employers would not <u>necessarily</u> mean it would run the hall the same way with FWEC and hence excuse FWEC's non-compliance with the Agreement. Alternatively, the arbitrator could perhaps construe the Agreement to have forbidden FWEC from repudiating the entire Agreement until it had provided LIUNA with a reasonable opportunity to cure by bringing its hiring hall into compliance with the law and the terms of the Agreement.[0]

All this is not to imply LIUNA is entitled to damages, but only to show that an arbitrator <u>might</u> award LIUNA damages. It is not our place to resolve or even to speculate on the solution to the questions we have posed in the preceding paragraph or to others which we have not raised, because they are matters of interpretation of the parties' pre-hire agreement, and as such are matters the

---

[0]Although the district court charged LIUNA with constructive knowl-edge of the illegality of the local hiring hall's procedures because it had placed the local in trusteeship, there is no evidence in the record that LIUNA officials actually knew that the hall was being run illegally. In fact, the evidence indicates that no party ever complained that the hiring hall was discriminating against non-union members. Perhaps, given the stakes, LIUNA would have promptly remedied the deficiency had someone brought it to LIUNA's attention.

parties entrusted to the sound judgment of a labor arbitrator. A court cannot refuse to order arbitration based on its perception of the frivolousness of the claim or the futility of doing so. See, e.g., A T & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649-50, 106 S. Ct. 1415, 1419 (1986) ("Whether `arguable' or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator."); Beck v. Reliance Steel Prods. Co., 860 F.2d 576, 579 (3d Cir. 1988).

Moreover, as the Supreme Court has explained, the arbitrator's informed judgment is "especially [helpful in reaching a fair solution to a problem] when it comes to formulating remedies." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 41, 108 S. Ct. 364, 372 (1987) (emphasis and internal quotations omitted). In light of these considerations, we conclude that the district court's finding that LIUNA operated an illegal hiring hall provides no reason to deny LIUNA's prayer for relief, compelled arbitration.

### D. What Should Be Arbitrated

We also conclude that on remand the district court should compel both FWEC and FWC to submit to arbitration. FWEC should arbitrate the dispute because it is a signatory to the Agreement. And as FWEC's admitted alter ego, FWC should also be ordered to submit to arbitration. As this Court's opinion in the parties' prior appeal made abundantly clear, the defendants' stipulation that

56

FWC and FWEC were alter egos[0] was critical to the determination of the arbitrability of LIUNA's claim against FWC, since unless the defendants were alter egos the district court could not compel FWC to arbitration under the Agreement.  See Laborers' Int'l Union, 868 F.2d at 576-77 ("The district court erred by letting an arbitrator determine whether FWC was an alter ego of FWEC and hence a party to the National Agreement.  That question is for the district court, not an arbitrator.").  Accordingly, that concession will now be enforced.

The validity of the Agreement and the expansiveness of its arbitration clause having already been established, once the defendants made this concession the district court's role in the grievance should have been over.  It should not have entertained the case beyond establishing those facts necessary to determine that the defendants were duty-bound to arbitrate LIUNA's grievance.  Accordingly, its conclusion that the defendants breached the Agreement exceeded its authority -- the broad arbitration clause reserved for an arbitrator the power to answer that question.[0]

---

[0]The colloquy at trial was as follows:

> THE COURT:  It is my understanding . . . that it is the defendants' position today that they are going to drop the alter ego issue before this Court.  Is that correct?
> MR. APRUZZESE:  We do not choose to contest it, your Honor.
> THE COURT:  I assume there's no objection. . . .
> MR. GREEN:  . . . The plaintiff has no objection to that amendment (sic).

Tr. at 6 (Jan. 22, 1991).
[0]We have assumed throughout this opinion without having expressly decided that the court, not the arbitrator, is the proper body to decide the date of repudiation insofar as it impacts the extent of the parties' duty to arbitrate.  Because the parties have not briefed the question, and seem to have accepted that as proper, both

## V. Conclusion

Because the Board's ruling in <u>Deklewa</u> applies retrospectively to the parties, FWEC never successfully repudiated the Agreement as to any location prior to its total termination of that agreement in July 1986. The Agreement contains a broad, inclusive arbitration clause, one whose reach extends to whether the Agreement governs operations at a specific construction site or not. Therefore, FWEC must arbitrate the dispute over application of the Agreement to the MOEPSI site with LIUNA according to the procedure specified in Article XV thereof. Since FWC is FWEC's alter ego, it too must comply with Article XV of the Agreement and proceed to arbitration alongside its subsidiary.

Accordingly, we will reverse the district court's June 22, 1992 order insofar as it concludes that <u>Deklewa</u> does not apply retrospectively to this case, that our earlier mandate vacated the arbitrator's two factual findings, and that the defendants breached the Agreement. We will remand with instructions that the court modify its June 22, 1992 Order, as revised by the orders of March 11 and 31, 1993, to direct the parties to submit to arbitration the issues of breach and the amount of damages allegedly sustained by LIUNA, its local, and its membership[0] on account of FWEC's alleged breach of the pre-hire agreement at the MOEPSI site up to the date of FWEC's effective termination of the Agreement, July 15, 1986.

---

parties have waived the issue, and our treatment of that issue does not imply that a court is always the proper forum to address it.
[0]We intimate no view whether LIUNA may pursue or recover damages on behalf of its local affiliate and/or membership under the facts of this case.

58